467 A.2d 615

Paul BURCH

v.

SEARS, ROEBUCK AND COMPANY, and General Electric Company, and Texas Instruments, Incorporated.

Appeal of GENERAL ELECTRIC COMPANY.

Paul BURCH

v.

SEARS, ROEBUCK AND COMPANY and General Electric Company and Texas Instruments, Incorporated.

Appeal of SEARS, ROEBUCK AND COMPANY.

Superior Court of Pennsylvania.

Argued April 7, 1983.

Filed Oct. 21, 1983.

446

Charles W. Craven, Philadelphia, for General Elec. Co., appellant (at No. 2330) and appellee (at No. 2367).

Keith Heinold, Philadelphia, for Sears Roebuck, Co., appellant (at No. 2367) and appellee (at No. 2330).

Louis Hinman, Philadelphia, for Burch, appellee.

James D. Wilder, Philadelphia, no appearance entered nor briefs submitted, for Texas Instruments, Inc., appellee.

Before SPAETH, WIEAND and HOFFMAN, JJ.

HOFFMAN, Judge:

Appellants Sears and General Electric contend that the lower court erred in this products liability action by denying their motions for judgment n.o.v. or for a new trial on grounds that the verdict was against the weight of the evidence. Appellant General Electric also contends the lower court erred in evidentiary rulings, in instructing the

jury, and in requiring it to indemnify Sears. We find these contentions without merit and, accordingly, affirm.

 In reviewing a denial of judgment n.o.v. we must view the evidence in the light most favorable to the verdict winner and draw all reasonable inferences and resolve all conflicts in testimony in that party's favor. *Schneider v. Albert Einstein Medical Center,* 257 Pa.Superior Ct. 348, 390 A.2d 1271 (1978). In reviewing a denial of a motion for a new trial we must consider all the evidence. Only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice should a new trial be granted. A lower court's decision in this regard will not be reversed absent an abuse of discretion. *Yandrich v. Radic,* 291 Pa.Superior Ct. 75, 435 A.2d 226 (1981). So viewed, the facts are as follows:

On August 8, 1970, appellee Paul Burch was cutting grass with an electric lawn mower. Twice the mower shut off and would not restart until he pushed the reset button. About the third time the motor shut off, he decided to unclog the rotor blade. He placed the mower on its side without disturbing the reset button, then reached in to remove clumps of grass with his left hand. The motor restarted, severely injuring his hand. His index and middle fingers were subsequently amputated, his ring finger permanently immobilized, and his thumb and little finger shortened.

On July 25, 1972, appellee sued Sears, which had originally sold the mower under its "Craftsman" brand name. Appellee alleged the lack of "deadman's switch," that would have automatically turned off the power when the operator released the controls, was a defect in the mower's design. On August 17, 1973, Sears sued General Electric, the supplier of the mower's electrical system including the reset button, motor, and on/off switch. General Electric in turn sued Texas Instruments, the manufacturer of the reset button and its thermal cut-off switch. After trial on February 7, 1979, the jury awarded appellee $20,000 plus interest against Sears. It found for Sears against General Electric

and exonerated Texas Instruments. The lower court, on September 2, 1980, entered judgment in favor of Burch and requiring equal contribution between Sears and General Electric. However, on September 30, it modified that judgment to require General Electric to wholly indemnify Sears. Post-trial motions were denied, and Sears and General Electric have appealed.

Appellants raise three sets of contentions concerning judgment n.o.v. and the weight of the evidence: (1) that appellee did not prove the lack of a deadman's switch was a "defect"; (2) that appellee's placing his hand near the blade was either extraordinary consumer behavior negating defect, a superseding cause, or an assumption of the risk; and (3) that the mower was substantially changed since leaving the seller.

Several courts have held that the lack of a deadman's switch, that would automatically turn-off machinery when a user relaxes his grip on the controls, presents a jury question of a lawn mower's defective design. *See Baker v. Outboard Marine Corp.*, 595 F.2d 176 (3d Cir.1979) (applying Pennsylvania law); *Daniels v. McDonough Power Equipment Inc.*, 430 F.Supp. 1203 (D.Miss.1977); *Schurr v. Royal Globe Ins. Co.*, 353 So.2d 215 (Fla.App.1977); *Hubbard v. McDonough Power Equipment, Inc.*, 83 Ill.App.3d 272, 38 Ill.Dec. 887, 404 N.E.2d 311 (1980). *See generally* Annot., 41 A.L.R.3d 986 (1972 & Supp.1982). A manufacturer or seller is strictly liable if a defect in its product causes injuries to a user. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966); Restatement (Second) of Torts § 402A. A product is defective if it is unsafe for its intended use. *Azzarello v. Black Bros. Co.*, 480 Pa. 547, 391 A.2d 1020 (1978). The finding of a defect requires a balancing of the utility of the product against the seriousness and likelihood of the injury and the availability of precautions that, though not foolproof, might prevent the injury. *Schell v. AMF, Inc.*, 567 F.2d 1259 (3d Cir.1977). When submitting the issue of defect to a jury, the court must first view the evidence in the light most favorable to the plaintiff to

determine if a defect may be found. *Azzarello v. Black Bros. Co., supra.*[1] Here, appellee's expert testified the mower was unsafe because it lacked a deadman's switch, such as is used on electric saws and drills, that would have turned-off the mower's electric current when the operator relaxed his grip. The expert testified that such switches, costing less than five dollars, were available at the time of design and could prevent inadvertent restarting and the attendant risks of injury. Appellants' expert countered with testimony that a deadman's switch had been considered, tested, and rejected during the design of this mower. He asserted that the deadman's switch would interfere with an operator's keeping the cord clear of the blade, would be less durable and therefore less reliable than the existing on/off switch, and finally might have its safety advantages negated by a consumer tendency to tie it in the "on" position. Viewing this evidence in the light most favorable to the verdict, we are satisfied that the jury could reasonably conclude that failing to provide the extra safety margin afforded by the deadman's switch rendered the product unsafe. Thus, judgment n.o.v. was properly denied. Upon considering all the evidence, it is neither patently unreasonable nor shocking to the conscience that the jury would give greater weight to appellee's expert testimony. Thus, the lower court's denial of a new trial on this point was not an abuse of discretion.

Appellants contend next that appellee's reaching his hand into the stalled mower constituted either a voluntary assumption of the risk or such extraordinary consumer behavior as to negate the defect or its causal connection to the accident. Because a product is defective only if it is unsafe for its intended use, *Azzarello v. Black Bros. Co., supra*, a finding of defect may be precluded when the

1. Sears' contention that the court, before submitting a products liability case to the jury, is required to determine as a matter of law that the evidence supports a "duty" to provide a product with the missing safeguard mischaracterizes the factual nature of the determination of a defect and the court's role as explained in *Azzarello v. Black Bros. Co., supra.*

plaintiff is injured when using the product in an "abnormal" manner. *Bartkewich v. Billinger,* 432 Pa. 351, 247 A.2d 603 (1968). An allegedly abnormal use will negate liability, however, only if it was not reasonably foreseeable by the seller. *Id.; Eshbach v. W.T. Grants & Co.,* 481 F.2d 940 (3d Cir.1973). For instance, a plaintiff's placing his hand into the operating machinery of a glass crusher was held so abnormal and unforeseeable as to preclude a finding of defect as a matter of law. *Bartkewich v. Billinger, supra. See Leach v. Jagenberg-Werke A.G.,* 480 F.Supp. 244 (E.D. Pa.1979). However, that a user might place a hand near apparently stopped machinery or parts has been held to be sufficiently foreseeable to sellers to raise a jury question as to defect for failure to provide adequate safeguards. *E.g., Schell v. AMF, Inc., supra; Elder v. Crawley Book Machinery Co.,* 441 F.2d 771 (3d Cir.1971); *Taylor v. Paul O. Abbe, Inc.,* 380 F.Supp. 601 (E.D.Pa.1974); *Dorsey v. Yoder Co.,* 331 F.Supp. 753 (E.D.Pa.1971), *aff'd mem.* 474 F.2d 1339 (3d Cir.1973). The related issue of causation is raised when the plaintiff's action is so reckless that the plaintiff would have been injured despite the curing of any alleged defect, or is so extraordinary and unforeseeable as to constitute a superseding cause. *Bartkewich v. Billinger, supra; Sherk v. Daisy-Heddon Corp.,* 498 Pa. 594, 450 A.2d 615 (1982) (firing gun at victim's head); *Dorsey v. Yoder, supra.* Finally, because assumption of risk may be a defense to a strict liability claim, *Ferraro v. Ford Motor Co.,* 423 Pa. 324, 223 A.2d 746 (1966), when the plaintiff places himself in a position of danger, while consciously aware of and appreciating the danger, and not as a result of momentary inattention or inadvertence, he may be found to have assumed the risk, thus precluding liability. *E.g., Schell v. AMF, Inc., supra; Green v. Parisi,* 478 F.2d 313 (3d Cir.1973). But if the plaintiff believed his hand to be in a safe position, the jury may conclude that he has not in fact assumed the risk. *Id.; Greco v. Bucciconi,* 407 F.2d 87 (3d Cir.1969). Here, appellee testified that the motor was completely stopped and silent as it had been on the two prior stall-outs when it would not start until he pushed the

reset button. His expert testified that the extra level of safety afforded by a deadman's switch could have prevented the motor from accidently restarting regardless of what had stopped the motor. Upon resolving doubts and conflicts in testimony, we find the jury could reasonably conclude that appellants could foresee that the motor might stall and that a user might attempt to unclog the blade by placing some part of his body near the blade. Thus, the conduct does not require a new trial or judgment n.o.v. on the issues of abnormal use or superseding cause. Similarly, the jury could reasonably conclude from the record that appellee believed the motor to be stopped so that it could not be restarted except by the reset button mechanism and therefore did not voluntarily assume the risk. Thus, the lower court did not abuse its discretion by denying the motions for judgment n.o.v. or new trial on these points.

Appellants' third contention is that the mower had been substantially changed in the seven years between its manufacture and the accident. If the condition of a product is "substantially changed" before it reaches the consumer, the manufacturer or seller will not be held strictly liable. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975); Restatement (Second) of Torts § 402A (e.g. raw material to finished goods). Also, if a product originally reaches the consumer as manufactured, and the plaintiff alleges a defect due to a malfunction, such as failing brakes, secondary causes, such as wear, tear, and deterioration may be found to have negated the causal link between the original condition of the product and the accident. *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974). Here, however, appellee asserts not an unexplained malfunction but a specific design defect—the lack of a deadman's switch as a safeguard against inadvertent restarting. None of the changes argued by appellants affected that design. Appellants showed that the mower had a replacement electrical cord, pitting and arcing on its plug, was purchased used, and had suffered wear and tear. Appellee rebutted the seriousness of the

pitting and arcing and the condition of the replacement cord. In resolving the conflicting testimony, the jury could reasonably have found that the cord and plug were not the cause of the stopping and restarting. Moreover, regardless of why the motor stalled, the jury had a basis to conclude that such stalling was foreseeable to the sellers and that the unchanged design lacking a deadman's switch failed to protect against uncontrolled restarting. Accordingly, the lower court properly denied judgment n.o.v. and new trial.

General Electric contends next that appellee's expert witness was not qualified to testify as an expert and that he lacked a factual basis on which to give competent testimony on the defectiveness of the design. The qualification of an expert witness is a matter within the discretion of the trial court. *Kravinsky v. Glover,* 263 Pa.Superior Ct. 8, 396 A.2d 1349 (1979). If the witness has "sufficient skill, knowledge, or experience in [the] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth," McCormick on Evidence, *supra* at 30 (footnote omitted), he or she is qualified as an expert. Once the expert shows he has some basis in fact for his opinion, his testimony is admissible. *Id.* Appellee's expert had a Ph.D. in mechanical engineering from the University of Pennsylvania. He did consulting work on the design of machinery, including safety devices, for Scott Paper Company and taught engineering at several universities. Even though he had never specifically designed lawnmowers, he nonetheless had a reasonable pretension to relevant specialized knowledge. He examined and tested this mower and its components after the accident. Although he never obtained or tested a similar mower with a deadman's switch and several years had elapsed between the accident and his tests, the lower court acted within its discretion in determining he did indeed have a basis in fact for his opinion on the design of the mower.

General Electric contends also that it should be granted a new trial because the lower court excluded photographs of the mower with which it sought to cross-examine

appellee's expert. Questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Lewis v. Mellor,* 259 Pa.Superior Ct. 509, 393 A.2d 941 (1978). The court may exclude evidence that is irrelevant or merely cumulative of other evidence. *Id.* Here, the excluded photograph showed tape on the mower's electrical cord three years after the accident. General Electric's cross-examination placed the fact of the tape before the jury, but not the photograph. After objection, counsel withdrew his hypothetical question about the significance of the tape to the stalling and restarting. Moreover, appellee's theory of a design defect affording insufficient protection against restarting did not depend heavily on the exact cause of the mower's stopping. Consequently, the lower court acted within its discretion in excluding the photograph.

General Electric contends next that the lower court erred when charging the jury on defect and assumption of risk. A trial judge has wide latitude in charging the jury, and may use any particular language provided he adequately and fully conveys to the jury the law applicable to the facts of the case. *Albert v. Alter,* 252 Pa.Superior Ct. 203, 381 A.2d 459 (1977); *Churchill v. Eakin,* 233 Pa.Superior Ct. 466, 335 A.2d 378 (1975). Contrary to appellant's allegations that the charge in effect mandated the jury to find a defect and misled it concerning the understanding of the danger needed for an assumption of the risk, we find the charge adequately and fairly presented the question to the jury. *See Azzarello v. Black Bros. Co., supra* (defect); *Jones v. Three Rivers Management Corp.,* 483 Pa. 75, 394 A.2d 546 (1978) (assumption of risk).

General Electric contends that the lower court erred in requiring it to indemnify Sears. Specifically, it alleges the jury's verdict did not support the court's judgment wholly shifting liability. Alternatively, it contends that if the verdict did not have that effect, it was against the weight of the evidence. We find these contentions without

merit. Under our products liability law, all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors, or any other relevant category, are potentially liable to the ultimate user injured by the defect. *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977); *Grubb v. Albert Einstein Medical Center*, 255 Pa. Superior Ct. 381, 387 A.2d 480 (1978); *Kitzinger v. Gimbel Bros., Inc.*, 240 Pa.Superior Ct. 345, 368 A.2d 333 (1976). This rule of law ensures the availability of compensation to the injured party, and helps place the burden of such injury on parties who, unlike the consumer, have a better opportunity to control the defect or spread its costs through pricing. *See Berkebile v. Brantly Helicopter Corp.*, *supra;* *Webb v. Zern*, *supra*. To further achieve these policies and to do justice among the potential defendants, Pennsylvania permits the remedies of indemnity and contribution [2] so that as among those in the chain of distribution liability may ultimately rest with, or be shared equally among, those who can best detect, control, or prevent the defect. 42 Pa.C.S.A. §§ 8321–8327; *Burbage v. Boiler Engineering & Supply Co.*, 433 Pa. 319, 249 A.2d 563 (1969); *Mixter v. Mack Trucks, Inc.*, 224 Pa.Superior Ct. 313, 308 A.2d 139 (1973). Indemnity, a common-law equitable remedy, shifts the entire loss from one defendant to another. *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368 (1951). Contribution is codified by statute, 42 Pa.C.S.A. §§ 8321–8327, and requires those who have liability of a concurrent character under the relevant tort law to share the loss equally. *See Builders Supply Co. v. McCabe, supra;* *Globe Indemnity*

---

**2.** Other states permit "apportionment" in strict liability cases, that is submitting the question of relative responsibility to the factfinder in each case, as is done in comparative negligence. *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978); *Dole v. Dow Chemical Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972); *City of Franklin v. Badger Truck Sales, Inc.*, 58 Wis.2d 641, 207 N.W.2d 866 (1973). *See* Model Uniform Products Liability Act § 111 (U.S.Dept. of Commerce 1979); Comment, Apportionment between Partmakers and Assemblers in Strict Liability, 49 U.Chi.L.Rev. 544 (1982); Note, Another Look at Strict Liability: The Effect of Contribution Among Tortfeasors, 79 Dick.L.Rev. 125 (1974).

*v. Agway Inc.*, 456 F.2d 472 (3rd Cir.1972). These remedies between defendants are available even against defendants whom the plaintiff does not sue, and their statute of limitations does not commence at the time of the plaintiff's injury. *Wnek v. Boyle*, 374 Pa. 27, 96 A.2d 857 (1953).[3] Thus, victims may not, by the timing of their complaint, choose which tortfeasor will pay, and defendants faced with the frequent occurrence of eleventh-hour lawsuits may still pursue their rightful equitable remedies against other tortfeasors. *Id.*

■■■ Indemnity, as the more drastic remedy, is "recognized in cases where community opinion would consider that in justice the responsibility should rest upon one [defendant] rather than the other." W. Prosser, Law of Torts 313 (4th ed. 1971) (quoted with approval *Mixter v. Mack Trucks, Inc., supra* ). Thus, indemnity is only available from those who are primarily liable to those who are merely secondarily or vicariously liable. *Builders Supply Co. v. McCabe, supra.* To evaluate primary as against secondary liability courts have focused on factors such as active or passive negligence and knowledge of or opportunity to discover or prevent the harm. *Id.* In chain of distribution cases, where there are many levels of contact with the product, and thus several possible degrees of liability, our courts have cited with approval Restatement of Restitution § 95 (1936):

> Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the

---

**3.** Rather, the statute of limitations commences when judgment is entered against the defendant seeking indemnity or contribution. *Id.* The litigation of these claims before that judgment, as during the plaintiff's initial lawsuit, is, in effect, an action for declaratory judgment. *See* Kutner, Statutes of Limitations and actions for contribution or indemnity, 33 Okla.L.Rev. 203 (1980).

other for expenditures properly made in the discharge of such liability.

*See Mixter v. Mack Trucks, Inc., supra.* The Restatement of Restitution also addresses indemnity in a chain of distribution case:

> Where a person has supplied to another a chattel which because of the supplier's negligence or other fault is dangerously defective for the use for which it is supplied and both have become liable in that to a third person injured by such use, the supplier is under a duty to indemnify the other for expenditures properly made in discharge of the claim of the third person, if the other used or disposed of the chattel in reliance upon the supplier's case and if, as between the two, such a reliance was justifiable.

Restatement of Restitution § 93(1) (1936). When adapting these standards to strict liability cases, *see Burbage v. Boiler Engineering & Supply Co., supra; Mixter v. Mack Trucks, Inc., supra,* our courts look to the facts rather than the form of liability alone, *id.,* and "view trade relations realistically rather than mythically." *Verge v. Ford Motor Co.,* 581 F.2d 384 (3rd Cir.1978).[4] Thus, in determining who may be "primarily responsible" and required to indemnify in a products liability case, our courts have evaluated the facts in light of products liability policies, particularly by focusing on opportunity to discover or actual knowledge of the defective condition and on the relative burdens of cor-

---

**4.** Thus, a traditional verbal formulation is that indemnity is available to parties whose liability is "imputed or constructive only, being based on some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible." *Builders Supply Co. v. McCabe, supra* 366 Pa. at 328, 77 A.2d at 371. Applied to landowners and employers who were vicariously liable for acts of builders on the land or employees who had actually created the danger, this test is compelling and easily applied. However, in a strict liability case all or several parties in the chain of distribution are held liable simply by a "rule of ... law." *Id.* Such liability, however, does not preclude the possibility of one defendant being negligent or more responsible in fact, under the scheme of the relevant products liability law, than other suppliers. *See Mixter v. Mack Trucks, Inc., supra.*

recting or preventing the defect. *Burbage v. Boiler Supply & Engineering Co., supra; Mixter v. Mack Trucks, Inc., supra; Verge v. Ford Motor Co., supra* (relevant facts include trade custom, relative expertise, and practicality).[5]

 Here, the jury's verdict can only be fairly interpreted as awarding full indemnity to Sears from General Electric. Although Sears' complaint, alleging that General Electric is "alone ... or jointly or severally liable or liable over," sought either indemnity or contribution in the alternative, *compare Globe Indemnity v. Agway, Inc., supra,* the lower court's jury instructions narrowed the issue to indemnity alone. "Sears has said that General Electric is the one liable.... [D]ecide if between Sears ... and General Electric which of those do you think is responsible." N.T. at 312. General Electric did not object, nor had it requested a point for charge on contribution. The jury's verdict, although it did not mention indemnity or exclusive liability, *compare Burbage v. Boiler Engineering & Supply Co., supra; Mixter v. Mack Trucks, Inc., supra,* did find General Electric liable "in the case of Sears ... versus General Electric." Verdict sheet. Thus, in light of the

5. As a matter of products liability law, Restatement (Second) of Torts § 402A left the questions of shifting or sharing liability among defendants to the subsequent development of case law. *Id.* Comment on Caveat p, q. The cases reveal various types of defects leading to varying allocations of liability. For injuries caused by malfunctioning components whose defective condition was hidden from subsequent assemblers and distributors, courts have required the component manufacturer to indemnify all other defendants. *Burbage v. Boiler Engineering & Supply Co., supra; Mixter v. Mack Trucks, Inc., supra; Tromza v. Tecumseh Products Co.,* 378 F.2d 601 (3d Cir.1967). For defective designs attributable solely to the assembler of the finished product and not known to or within the control of other partmakers or suppliers, courts have required the assembler to bear the entire loss. *See Taylor v. Paul O. Abbe, Inc., supra; Mayberry v. Akron-Rubber Machinery Corp.,* 483 F.Supp. 407 (N.D.Okla.1979). Finally, where the absence of a safety device or an obvious feature of design is the defect, courts make a closer examination of the relative roles and control over design of the various defendants, whether partmakers, assemblers, or subsequent distributors. *Verge v. Ford Motor Co., supra; Ford Motor Co. v. Russell & Smith Ford Co.,* 474 S.W.2d 549 (Tex.Civ.App.1971).

court's instruction, the jury awarded indemnity to Sears. We must therefore determine, under General Electric's contentions in post-trial motions and on appeal, whether the lower court acted within its discretion in finding the verdict of indemnity consistent with the weight of the evidence and in denying judgment n.o.v. *See Yandrich v. Radic, supra* (scope of review).

The non-party Roper Corporation designed, tested, and assembled this mower. General Electric had supplied the electrical system. A Roper design engineer testified that General Electric shared responsibility for safety features in the electrical system and could have vetoed the lack of a deadman's switch. (N.T. February 6, 1979 at 235–36, 263–64). Although Sears marketed the mower under its brandname and with an owner's manual showing the defective design, no evidence indicated that Sears directly controlled the design or had available the expertise to evaluate its safety. *See Verge v. Ford Motor Co., supra.* In determining liability to consumers, courts have noted that the lack of a deadman's switch on a lawnmower is an obvious design defect apparent to a non-manufacturer retailer, *Daniels v. McDonough Power Equipment Inc., supra,* and that the act of placing one's name on a product is a factor in assessing responsibility because it frequently causes a product to be used in reliance upon the seller's reputation, Restatement (Second) of Torts § 400. However, as between Sears, the non-manufacturer retailer, and General Electric, which was engaged in the manufacture and thus creation of the dangerous condition, this record supports the jury's award of indemnity to Sears. Taking all facts and reasonable inferences in favor of the verdict, the jury could conclude that General Electric was primarily liable for the creation of the danger and that Sears, justifiably relying on its suppliers, was only secondarily liable. *See Mixter v. Mack Trucks, Inc., supra;* Restatement of Restitution §§ 93, 95. Thus, judgment n.o.v. was properly denied. Because the record is virtually devoid of evidence of Sears' role in the design of this mower, other than the brandname

and owner's manual, upon reviewing all the evidence it is neither patently unreasonable nor shocking to the judicial conscience that the jury would place greater weight on the direct evidence of General Electric's role in manufacturing the mower. Thus, the denial of a new trial because of the weight of the evidence was not an abuse of discretion. Accordingly, we are satisfied that this record supports the jury's verdict of indemnity and the court's judgment entered upon that verdict.

Affirmed.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting:

On August 8, 1970, Paul Burch was cutting wet grass with a seven year old, electric power mower which had been purchased second hand from a florist. The wet grass became impacted and "choked" the cutting action of the blade. Without turning off the electrical switch and without disconnecting the cord from the electrical supply, Burch turned the mower on its side, reached into the blade area, and began to remove the impacted, wet grass.[1] After some of the wet grass had been removed, the blade started again to rotate and in the process cut off several fingers from Burch's hand. The majority holds that a jury could find that the 1963 mower was designed defectively because a professor of mechanical engineering, who had no experience whatsoever in designing or marketing electrical power mowers, believed the machine would have been safer if it had been equipped with a deadman's switch. I dissent.

There was no evidence of a manufacturing defect, i.e., an accidental variation caused by a mistake in the manufactur-

---

[1] All counsel, including counsel for Burch, concede that Burch did not turn off the machine before attempting to remove impacted grass. An apparently inconsistent statement in the record by Burch that he had "turned off" the lawn mower is attributed by his attorney to an error in transcribing the notes of testimony. Brief for Appellee, Paul Burch at p. 6. The correct transcription, counsel agree, would have been that Burch "turned over" the machine, not that he "turned off" the same.

ing process. The machine had previously been used for seven years. Burch contended, rather, that the mower, although manufactured in conformity with its intended design, was defective because the design itself created a defective condition unreasonably dangerous to users.

The electric power mower in the instant case was retailed by Sears, Roebuck Co. in 1963 under the tradename "Craftsman." It had been designed and manufactured by Roper Corporation. General Electric had supplied the electric motor; and Texas Instruments, Inc. had manufactured the manual "on-off" switch which was mounted on the handle of the mower. At the time of the accident, according to the evidence, the original switch was no longer on the machine, having been replaced by another. The machine also contained a thermal shut-off control on the motor and an electrical cord which, when connected, delivered the electricity necessary to energize the lawn mower.

"Unlike workmen's compensation and no-fault automobile insurance, strict liability is not a no-fault system of compensation." *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 806, 395 A.2d 843, 845–846 (1978). When courts are confronted with claims of design defects, the issues are usually complex. Design choices are multi-faceted. They must comprehend and consider the various accident situations in which the product may be involved. Design choices must also reflect considerations of marketability, i.e., whether machines such as lawn mowers, with increased safety precautions at necessarily higher prices, are marketable in competition with less expensive machines having fewer safeguards manufactured by others. Consumers willing to assume the risk and who want to be able to buy at lower prices may choose models that do not contain extensive safety precautions with which more expensive models are equipped.

In a design defect case, it must first be shown that there exists a defective condition unreasonably dangerous to the user. A defective condition exists when "the product is, at the time it leaves the seller's hands, *in a condition not*

*contemplated by the ultimate consumer,* which will be unreasonably dangerous to him." Restatement (Second) of Torts, § 402A, comment g (emphasis supplied). In *Cornell Drilling Company v. Ford Motor Company,* 241 Pa.Super. 129, 136, 359 A.2d 822, 825 (1976), this Court quoted Prosser, Law of Torts, 659 (4th ed. 1971) to state the prevailing view that a product is defective if it "does not meet the reasonable expectations of the ordinary consumer as to its safety."

The manufacturer of an electric power mower is not an insurer and is under no obligation to make an accident proof product. He is not required to design a mower which will cut nothing but grass. Some products, such as hatchets, carving knives, and power lawn mowers, contain obvious dangers. Manufacturers cannot foresee and protect against every absurd and dangerous use that may be made of a product. They are required to foresee and protect the consumer only from the probable results of the normal use of the product. Sometimes, a warning will be all that is required. Even a warning is unnecessary, however, where the danger is obvious. Thus, there is no need to warn that a knife will cut. Consumers, themselves, have a responsibility to guard against obvious dangers in the use of a product.

Inquiry into the design of a product must also consider social utility. "The utility of the product must be evaluated from the point of view of the public as a whole, because a finding of liability for defective design could result in the removal of an entire product line from the market. Some products are so important that a manufacturer may avoid liability as a matter of law if he has given proper warnings." *Thibault v. Sears, Roebuck & Co., supra,* 118 N.H. at 807, 395 A.2d at 846.

Perhaps the most important evidence in a defective design case is evidence of the state of the art at the time a product is manufactured. This helps to determine the expectation of the ordinary consumer. *Bruce v. Martin-Marietta Corp.,* 544 F.2d 442 (10th Cir.1976). Relevant to show

the state of the art are industry design standards, design guidelines adopted by authoritative voluntary associations, and design criteria established by legislation or regulations of administrative agencies. See: *Owens v. Allis-Chalmers Corp.*, 83 Mich.App. 74, 268 N.W.2d 291 (1978), *aff'd*, 414 Mich. 413, 326 N.W.2d 372 (1982); *Hubbard v. McDonough Power Equipment, Inc.*, 83 Ill.App.3d 272, 38 Ill.Dec. 887, 404 N.E.2d 311 (1980). See also and compare: *Meyer v. Heilman*, 307 Pa.Super. 184, 188, 452 A.2d 1376, 1378 (1982), allocatur granted March 29, 1983 (evidence that competitors' tractors of a similar vintage were designed with a safety device which would have prevented injury).

The design engineer who had designed the Craftsman electrical power mower in this case testified and produced evidence which established that the foregoing factors had been considered prior to manufacture. Studies conducted by the manufacturer showed that a machine containing a manual, "on-off" switch was not only less expensive and more desirable to consumers but also safer to use than one containing a deadman's switch. Electric power mowers containing deadman's switches were less maneuverable and resulted in frequent cuttings of the cord. They were more hazardous, studies showed, because of the ease with which inadvertent startings occurred and also because of the tendency of consumers to tie or wire the switch into an "on" position to avoid the necessity for constant pressure on the switch while the mower was in use. Appellee relied upon the testimony of a professor of mechanical engineering, who had had no experience in designing, manufacturing or marketing electrical or other power mowers and who had not examined the offending machine until four years after the accident. This witness was not aware of industry standards and regulations in 1963, if any existed, and was not privy to information then available to and relied upon by designers of electric power mowers. He testified that deadman's switches were available in 1963—a fact which all defendants conceded—and that they were relatively inexpensive. He was permitted to testify, over objection, that in his opinion the electrical power mower designed in 1963

should have been equipped with a deadman's switch because it would have rendered the machine safer and would have prevented the accident which injured Paul Burch. He offered no design criteria or applicable design standards that would have enabled the court or jury to determine objectively that the manufacturer had breached a duty to consumers generally by putting on the market a defectively designed lawn mower. He could not say that deadman's switches were in widespread use on similar electric mowers manufactured by others in 1963.

Who determines whether the absence of a deadman's switch on a 1963 electric power mower has rendered the machine defective for purposes of imposing strict liability upon the manufacturer? The Supreme Court asked a similar question in *Azzarello v. Black Brothers Company, Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978). Its concern was contained in its observation that "[w]hile a lay finder of fact is obviously competent in resolving a dispute as to the condition of a product, an entirely different question is presented where a decision as to whether that condition justifies placing liability upon the supplier must be made." *Id.*, 480 Pa. at 556, 391 A.2d at 1025 (footnote omitted). This question, the Court concluded, did not fall within the orbit of a factual dispute which could properly be left to the jury for resolution. The Court said:

"Should an ill-conceived design which exposes the user to the risk of harm entitle one injured by the product to recover? Should adequate warnings of the dangerous propensities of an article insulate one who suffers injuries from those propensities? When does the utility of a product outweigh the unavoidable danger it may pose? These are questions of law and their resolution depends upon social policy. Restated, the phrases 'defective condition' and 'unreasonably dangerous' as used in the Restatement formulation are terms of art invoked when strict liability is appropriate. It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury

to determine whether the facts of the case support the averments of the complaint. They do not fall within the orbit of a factual dispute which is properly assigned to the jury for resolution."

*Id.*, 480 Pa. at 558, 391 A.2d at 1026. See also: Green, Foreseeability in Negligence. Law, 61 Columbia L.Rev. 1401, 1418 (1961); *Dambacher v. Mallis*, Pa.Super. (J. 1725/82; filed June 17, 1983) (Dissenting Opinion by Spaeth, J.).[2] Spaeth, J.).[2]

The trial court did not make a determination of strict liability in this case but submitted it to the jury to determine whether strict liability should attach to a 1963 electric mower marketed without a deadman's switch. This, according to my understanding of *Azzarello*, was error.

Whether strict liability is appropriate in this case is a judicial decision. The record in the case discloses no criteria that would enable either a court or jury to determine that the manufacturer had designed and marketed a defective and unduly hazardous machine. In the absence of legislative or other extra-judicial criteria for determining that a product has been defectively designed so as to be unreasonably dangerous, "the manufacturer of a machine ... dangerous because of the way in which it functions, and patently so, owes to those who use it a duty merely to make it free from latent defects and concealed dangers." *Myers v. Montgomery Ward & Co., Inc.*, 253 Md. 282, 294, 252 A.2d 855, 863 (1969), quoting from *Kientz v. Carlton*, 245 N.C. 236, 241, 96 S.E.2d 14, 18 (1957). See also: *Denton v. Bachtold Brothers, Inc.*, 8 Ill.App.3d 1038, 291 N.E.2d 229 (1972); Restatement (Second) of Torts, § 402A, comment g. Compare: *Clark v. Sears, Roebuck and Company*, 254 So.2d 62 (La.App.1971). See generally: Annotation, Liability of Manufacturer or Seller of Power Lawnmower For Injuries to User, 41 A.L.R.3d 986 (1972). When marketed, the electric power mower in this case contained no latent defects or concealed dangers. I would hold, therefore, that strict liability was not appropriate. After studying the

2. Reargument before a court en banc has been granted.

evidence pertaining to the "state of the art" in 1963, the total lack of extra-judicial standards or guidelines requiring deadman's switches on electric power mowers (as distinguished from riding mowers), and the results of market studies made by the manufacturer, which were unrebutted, I would hold that an electric power mower designed with an electric cord and an "on-off" switch was neither "defectively designed" nor "unreasonably dangerous." See: *Myers v. Montgomery Ward & Co., supra; Kientz v. Carlton, supra.* See also: 41 A.L.R.3d 986.

In *Owens v. Allis-Chalmers Corp.*, 414 Mich. 413, 326 N.W.2d 372 (1982), a design defect case raising issues similar to those in the instant case, the plaintiff sought to establish that a forklift had been defectively designed because of the absence of restraints which would have prevented the operator from being thrown from the operator's compartment if the forklift rolled over. The plaintiff's expert witness was a physicist who had worked for General Motors for twelve years in the area of vehicle safety. He testified that the forklift would have been safer in view of the manner in which the accident happened if it had been equipped with a seat belt or other restraint system. The expert, however, "had never designed a forklift, nor any part of one, and had not worked in conjunction with their manufacture. He had operated one during a summer about 30 years prior to trial, but not since. Apart from preparing for this litigation, the record [was] not clear concerning whether any of his work in the area of vehicle safety had related specifically to forklifts. He testified, however, that a forklift was just another type of vehicle to which much of his work on vehicles in general would be applicable." *Id.* at 418, 326 N.W.2d at 374. The expert witness admitted also that he was not aware of any law, safety regulation, standard or policy that required or suggested the use of restraints, and that he was unaware of any forklift manufactured with restraints. The defendant moved for a directed verdict on the grounds that the record lacked any basis for the expert's assertion that restraints were needed, and that the expert's unsubstantiated opinion was insufficient to

establish a prima facie case. The trial court granted the defendant's motion. The Supreme Court, after demonstrating obvious concern about the troublesome issue of holding a product defective merely because of a failure to equip it with all possible safety devices, affirmed. The testimony of plaintiff's expert was insufficient, without evidence of other design criteria available to the manufacturer, to warrant submitting the issue to a jury. The court said:

"Our conclusion that the plaintiff did not present a prima facie case is based on the lack of evidence concerning both the magnitude of the risks involved and the reasonableness of the proposed alternative design. Although from the testimony of plaintiff's expert one might infer that a forklift rollover and the injuries resulting from being pinned under the overhead protective guard were foreseeable, neither his testimony nor any other evidence on the record gave any indication how likely such an event might be. In conjunction with this uncertainty, the record also produces no indication how the use of any of the driver restraints would affect a forklift operator's ability to do his or her job or the operator's safety in other circumstances.

. . . . .

Viewing the evidence in a light most favorable to the plaintiff, we cannot conclude that plaintiff established a prima facie case for either negligence or a defective product. Even if this Court could take judicial notice that the costs involved in attaching a seat belt or other designated restraint to a forklift would not be great, we cannot take judicial notice that their use by forklift drivers would be likely, practical, or more safe. Neither the costs nor the effects of the other restraints were established.

Significantly, the defendant did offer the cage enclosure, which was one of the suggested restraints, as an option. The question then becomes whether such a cage enclosure should have been installed as standard equipment. Although plaintiff's expert acknowledged that some drivers are frequently in and out of their vehicles, there was no testimony concerning the effects of a cage

upon the driver's ability to perform his or her work. There also was no factual testimony concerning the safety of an operator in a cage enclosure in a roll-over or in any foreseeable accidents or emergencies other than roll-overs....

In the entirety of plaintiff's proofs, there is no data or other factual evidence concerning the magnitude of the risks involved, the utility or relative safety of the proposed alternatives, or evidence otherwise concerning the 'unreasonableness' of risks arising from failure to install driver restraints on the subject forklift model as standard equipment.

Manufacturers are not insurers that 'in every instance and under all circumstances no injury will result from the use' of their products. *E.I. DuPont de Nemours & Co. v. Baridon,* 73 F.2d 26 (CA 8, 1934).

Therefore, we find that the trial court did not err. The plaintiff's evidence did not raise an issue of fact concerning any unreasonable risk at the time of the design or manufacture of the vehicle."

*Id.* at 429–432, 326 N.W.2d at 378–379.

The majority says that "[s]everal courts have held that the lack of a deadman's switch, that would automatically turn off machinery when a user relaxes his grip on the controls, presents a jury question of a lawn mower's defective design." This is misleading. The cases cited by the majority did not involve electric power mowers comparable to the mower in the instant case. They involved riding mowers. *Baker v. Outboard Marine Corp.,* 595 F.2d 176 (3rd Cir.1979) (plaintiff alleged that riding mower was defectively designed as a result of, inter alia, absence of deadman's switch which would stop mower when operator left the seat); *Daniels v. McDonough Power Equipment, Inc.,* 430 F.Supp. 1203 (S.D.Miss.1977) (plaintiff alleged that riding mower was defectively designed due to lack of device to automatically disengage wheels and/or blades when operator was removed from seat); *Schurr v. Royal Globe Insurance Co.,* 353 So.2d 215 (Fla.App.1977) (plaintiff alleged that riding lawn mower was defectively designed due

to absence of deadman's switch); *Hubbard v. McDonough Power Equipment, Inc., supra* (1980) (plaintiff alleged that riding lawn mower was defectively designed because it was dynamically unstable and lacked a deadman's switch). There is a substantial difference between riding mowers and manually operated mowers in which only the blades are powered electrically. Riding mowers, if not equipped with a deadman's switch, will move forward eccentrically with blades rotating and substantial risk when not subject to the operator's control. An electric mower of the type here involved moves forward only when physically pushed or pulled by the operator. If the operator loses control, the motion of the machine ceases as soon as he loosens his grip. Although the blade continues to rotate, the machine is stationary. The risks inherent in the two types of machines are vastly different and their designs entail different considerations.

In the instant case, moreover, Burch's placing his hand into the blade area of this electric lawn mower to remove impacted grass without disconnecting the machine from the electric supply, either by removing the cord from the outlet or by using the "on-off" switch, was so unusual and so abnormal that the manufacturer could not be expected to protect Burch from his own conduct. See and compare: *Bartkewich v. Billinger*, 432 Pa. 351, 247 A.2d 603 (1968).

If, as the majority and at least one federal court decision [3] seem to imply, the language of *Azzarello* is not to be followed literally and the defectiveness of the design of a power lawn mower which conceivably could have been equipped with additional safety features is for the jury, I should hold, nevertheless, that a new trial is required in this case. I should conclude that plaintiff's expert was unqualified to express an opinion concerning the design of this electric lawn mower in 1963 and that, in any event, the verdict was contrary to the clear weight of the evidence.

"An expert witness has been defined as a person who possesses knowledge not within the ordinary reach and

3. See: *Hollinger v. Wagner Mining Equipment Company,* 667 F.2d 402, 410 n. 11 (3rd Cir.1981).

who, because of this knowledge is specially qualified to speak upon a particular subject." *Erschen v. Pennsylvania Independent Oil Company,* 259 Pa.Super. 474, 477, 393 A.2d 924, 926 (1978). As a general rule, the qualification of an expert witness is a matter within the discretion of the trial court. *Abbott v. Steel City Piping Company,* 437 Pa. 412, 421, 263 A.2d 881, 885 (1970); *Duffy v. National Janitorial Services, Inc.,* 429 Pa. 334, 338, 240 A.2d 527, 529 (1968). An expert witness cannot be found qualified to express an opinion regarding matters beyond the ken of the average layperson, however, unless the witness has "sufficient skill, knowledge or experience in that field or calling to make it appear that his opinion or inference will probably aid the trier in his search for truth." McCormick on Evidence, p. 30 (2d ed. 1972). This requires that the witness demonstrate "special knowledge of the very question upon which he promises to express his opinion." *Jones Appeal,* 449 Pa. 543, 551 n. 5, 297 A.2d 117, 121 n. 5 (1972); *Sweeney v. Blue Anchor Beverage Co.,* 325 Pa. 216, 189 A. 331 (1937).[4]

In the instant case, appellee's expert failed to possess the special knowledge necessary to express an opinion pertaining to the design of an electric lawn mower in 1963. His qualifications were limited to the fact that he held a Ph.D. in mechanical engineering and had taught engineering at several universities. His degree in mechanical engineering, I suggest, is not an adequate basis upon which to permit expression of an opinion regarding the design criteria available and applicable to the design of electric lawn mowers in 1963. The design and marketing of power mowers are not matters within the expertise or experience of each and

---

4. It has sometimes been said that a witness may testify as an expert if he has any "pretension" to specialized knowledge. In my judgment, such a statement of the rule is unfortunate. I agree with Judge Spaeth that it is not "helpful to ask whether a witness has 'any reasonable pretension to specialized knowledge.' A 'pretension' is 'an assertion or declaration whose truth is questioned or falsity suspected; an allegation of doubtful value; a pretext.' Webster's New International Dictionary 1959 (2d ed. 1938)." *Ragan v. Steen,* 229 Pa.Super. 515, 528, 331 A.2d 724, 736 (1974) (Concurring Opinion by Spaeth, J.).

every engineer. One needs specific knowledge, training, or experience to express an opinion on safety criteria available for use in designing and marketing power lawn mowers. Appellee's expert had no such knowledge, training or experience. He had never studied, designed, marketed or even repaired an electric lawn mower and had never consulted with or worked for anyone who did. He did not pretend to know or understand the market for lawn mowers in 1963 and was unaware of safety standards, governmental regulations or design criteria then applicable. He had never participated in consumer testing of lawn mowers, and had never tested a lawn mower until he examined the lawn mower in this case four years after the accident. In short, there was no evidence that he had ever had any experience of any kind, direct or indirect, in the design or even use of electric or others type of power lawn mowers. Under these circumstances, his degree and academic background in mechanical engineering were insufficient to demonstrate that special knowledge or experience which would enable him to provide meaningful opinion evidence relevant to the complex and multi-faceted issue of the design of electric power mowers in 1963. To permit him to express an expert opinion on this issue, in view of the lack of his qualifications to do so, was reversible error.

Assuming for purposes of argument that a jury could consider his opinion testimony, I would hold that the verdict was against the weight of the evidence. The opinion of appellee's expert was based on such a lack of experience and knowledge regarding electrical lawn mowers, and the contrary evidence was so substantially supported by actual consumer studies that a verdict based on the former should be set aside and a new trial awarded so that justice may be given another opportunity to prevail. For the manufacturer to have ignored the results of its own market studies and, nevertheless, to have marketed machines making general use of deadman's switches on non-riding, electrical lawn mowers would have demonstrated such a gross and willful disregard for the safety of members of the consuming public that it may well have supported a future award of

punitive damages in favor of one injured as a consequence thereof. See: *Martin v. Johns-Manville Corporation*, Pa. Super., 322 Pa.Superior Ct. 348, 469 A.2d 655 (1983).

My review of the record suggests also that the weight of the evidence was clearly to the effect (1) that the legal cause of plaintiff's injury was not a defective design of the electric lawn mower but the careless, if not reckless, act by which he inserted his hand into the blade to remove grass without turning off the lawn mower or otherwise disconnecting the supply of electricity; and (2) that the absence of a deadman's switch on the lawn mower used by appellee was patently obvious to any user and that one who chose to use such a machine knowingly and voluntarily assumed the risk inherent in operating a power mower without a deadman's switch.

Finally, I am unable to agree with the majority that General Electric Company, which supplied an electric motor according to design specifications of the manufacturer and/or retailer of this electric lawn mower can properly be called upon to indemnify the manufacturer and/or retailer when either is found liable to a consumer for marketing a defectively designed machine. Because a thorough analysis of this issue is not essential to my view of the case, however, I leave further discussion of the right to indemnification in design defect cases until another day.