**Ada I. STEVENS, Administratrix of the Estate of Leon F. Stevens, Deceased**

v.

**CESSNA AIRCRAFT COMPANY.**

No. Civ. A. 82–0219.

United States District Court, E.D. Pennsylvania.

April 10, 1986.

---

Soren P. West, Lancaster, Pa., for plaintiff.

John J. Marshall, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

On August 22, 1985, a ten-person jury returned a defense verdict in this case involving death resulting from the crash of an airplane manufactured by defendant Cessna Aircraft Company. Plaintiff Ada I. Stevens, the former wife of decedent Leon Stevens, has moved for a new trial. She claims that the verdict was against the weight of the evidence and that prejudicial error was committed during the course of and after the trial. As explained below, I find no reason to order a new trial, so I will deny the motion.

## I. BACKGROUND

### A. *The Crash*

Early in the morning of January 24, 1980, Mr. Stevens was killed when the Cessna 411A aircraft that he was piloting crashed shortly after takeoff at Port Columbus Airport in Columbus, Ohio. Mr. Stevens, the only occupant of the airplane, had been licensed as a commercial pilot by the Federal Aviation Administration (FAA) since 1973. At the time of the accident, he was operating a cargo route for Volunteer Aviation, Inc., an air charter service located in his hometown of Clarksville, Tennessee. His previous experience with Volunteer in-

volved flights on Cessna 402 airplanes; he had never before operated a Cessna 411A. The 411A is similar to the 402, but the 411A has a somewhat smaller rudder and larger engine.

Mr. Stevens left Clarksville on the evening of January 23d, and made one stop in Louisville, Kentucky, before arriving at Columbus. After taking on cargo at Columbus, Mr. Stevens took off at 2:40 a.m. He slowly climbed to about 100 feet, and then lost power in his left engine. Within seconds, he called the tower identifying the emergency. Immediately, the tower cleared him to land, and he then made a shallow turn to the left. Nineteen seconds after Mr. Stevens first notified the tower of the engine failure, his plane crashed, and was consumed by fire. Later examination of the aircraft revealed that the landing gear had never been retracted and that the left propellor had not been feathered.

At the time of engine loss, the plane's speed was between 115 and 120 miles per hour. After the engine failed, the speed dropped to less than 100 m.p.h., causing the aircraft to stall and then plummet. The 411A owner's manual contained the following instruction:

> RECOMMENDED SAFE SINGLE–ENGINE SPEED. Although the aircraft is controllable at the minimum control speed, the aircraft performance is so far below optimum that continued flight near the ground is improbable. A more suitable recommended safe single-engine speed is 105 MPH, since at this speed altitude can be maintained more easily while the landing gear is being retracted and the propeller is being feathered.

## B. *The Decedent*

At the time of his death, Mr. Stevens, a 29-year-old Army warrant officer, was enrolled as a full-time student at Embry-Riddle Aeronautical University at Fort Campbell, Kentucky. Mr. Stevens, who had accumulated about 2500 hours of flight time with Army helicopters, was being paid by the Army to pursue a degree in aeronautical science at Embry-Riddle. At the same time, he was employed by Volunteer as a part-time cargo pilot.

Mr. Stevens had been married four times, and had five children—two with plaintiff, his first wife; one with his second wife; and two with a woman whom he had never married. At the time of the crash, he was living with Sandra Graham, a different woman to whom he was not married. On January 22d, Mr. Stevens and Graham quarreled. According to Graham, Stevens left their home that night and went drinking. Volunteer chief pilot Norman Knofs testified that Mr. Stevens had not been scheduled to fly to Columbus on the night of the 23d, but requested the assignment a few hours before take-off because he wanted to get out of his house.

## C. *The Trial*

Mrs. Stevens brought this strict liability suit as administratrix of the estate of decedent. She contended that the airplane was defective in the following ways: the rudder was too small to control the plane in single-engine flight; excessive rudder pedal forces were needed to control the craft in single-engine flight; the floor of the cockpit contained a contour interruption that hindered a pilot's ability to exert force on the rudder pedal; the seat back was overly flexible, also making it difficult for a pilot to exert necessary pressure on the rudder pedal; and the owner's manual contained inaccurate and misleading information resulting in a failure to warn. She claimed that the instruction on minimum airspeed was misleading in that 105 m.p.h. is not sufficient to maintain altitude. Mrs. Stevens further claimed that these defects were the proximate causes of the crash and of Mr. Stevens' death.

At trial, Cessna disputed both that the airplane contained any defect and that a defect proximately caused the accident. It argued, instead, that the crash resulted from Mr. Stevens' inattention and misuse of the aircraft. According to Cessna, Mr. Stevens could easily have landed the plane safely had he simply descended at the moment that his left engine lost power. At

that point, he was only 100 feet in the air, with the landing gear extended, and there was approximately 6,000 feet of runway ahead of him. Cessna maintained that instead of following a safe course, Mr. Stevens took steps that he, as a trained pilot, knew were improper, such as: allowing his airspeed to drop to a dangerously low level; continuing to fly without retracting the landing gear or feathering the propellor; and making a deliberate shallow left turn.

Cessna's explanation for what it termed Mr. Stevens' inexplicable misuse of the plane came from Dr. Charles Berry, a physician trained in aeronautical psychology. Dr. Berry made a study of Mr. Stevens' life, and interviewed many of his associates, including Ms. Graham, his co-workers, and one of his professors. Dr. Berry testified that experts in his field routinely gather the same type of information that he had obtained about Mr. Stevens, and rely upon this information in forming their opinions. Dr. Berry had had opportunities to make similar studies himself in his capacities as a certified FAA medical examiner and as director of medical research for NASA in Texas. He concluded that Mr. Stevens was under a great deal of stress in his personal life and that this stress caused him to lose the concentration necessary for flying.

Dr. Berry also repeated for the jury information that he had been told by Ms. Graham and others. He made reference to the fact that Mr. Stevens had gone out drinking on the night of the 22d—about 24 hours before he took off. He mentioned the drinking episode for two reasons: first, as an indication of the stress in Mr. Stevens' life; and second, because he claimed that residual effects from alcohol sometimes hamper perception, even as long as a day after drinking. Cessna never suggested that Mr. Stevens was intoxicated during the flight; in fact, an autopsy revealed .0% alcohol in his blood. I allowed the introduction of this testimony with a limiting instruction that the jury should consider the evidence only for the purpose for which it was offered.

Toward the end of the eleven-day trial, I held a charge conference with counsel, and discussed the charge as well as the special interrogatories that would be submitted to the jury. Before their closings, counsel for both parties had an opportunity to review the interrogatory form, which consisted of four straightforward liability questions: one asking if there was a design defect in the airplane; the second asking if the defect proximately caused the crash; the third asking if there had been a failure to warn; and the last interrogatory inquiring if the failure to warn proximately caused the crash.[1]

### D. *The Verdict*

The ten-person jury deliberated for about four hours before returning a verdict on the morning of August 22, 1985. The jurors answered "yes" to interrogatories numbers 1 and 3, and "no" to numbers 2 and 4. In other words, they found that the

---

1. This case was tried on a bifurcated basis, so the interrogatories addressed only liability. The verdict sheet read as follows:

    I. DESIGN DEFECT.

    1. Do you find that the Cessna 411A aircraft manufactured by defendant Cessna Aircraft Company was in a defective condition, that is, it was unsafe for its intended use, at the time it left the control of the defendant manufacturer, because of its defective design?
    YES__ NO__
    (If your answer is yes, proceed to interrogatory no. 2; if your answer is no, proceed to interrogatory no. 3.)

    2. Do you find that the defective design of the Cessna 411A aircraft was a substantial factor in causing the injuries sustained by Leon F. Stevens?
    YES__ NO__
    (Proceed to interrogatory no. 3.)

    II. INADEQUATE WARNING DEFECT.

    3. Do you find that the Cessna 411A aircraft manufactured by defendant Cessna Aircraft Company was in a defective condition, that is, it was unsafe for its intended use at the time it left the control of the defendant manufacturer, because of the lack of adequate warnings provided by the defendant manufacturer?
    YES__ NO__
    (If your answer is no, stop here. If your answer is yes, proceed to interrogatory no. 4.)

    4. Do you find that the lack of adequate warning was a substantial factor in causing the injuries sustained by Leon F. Stevens?
    YES__ NO__

airplane was defective both in design and in its warnings, but they concluded that these defects did not proximately cause the accident. At Mrs. Stevens' request, the jury was polled. The questions were repeated to each juror, and each responded in the same manner—"yes" to numbers 1 and 3, and "no" to numbers 2 and 4. At that point, I spoke briefly with the lawyers for both parties, and then thanked and excused the jury, saying that a verdict would be entered in favor of Cessna. Lunch had already been ordered for the jury, and nine of the ten jurors went to the jury room to eat.

Shortly after I excused the jurors, the jury foreman approached the deputy clerk, and asked if the verdict were final. He explained that some jurors had been confused, and thought that they were registering a verdict in favor of plaintiff. The deputy clerk immediately informed me of this conversation, and later made a record of it.

During the next few days and weeks, the attorneys for both sides spoke to the jurors, inquiring as to their understanding of the verdict form. Mrs. Stevens acknowledges that some jurors fully recognized the legal significance of their answers to the interrogatories. But she contends that between four and six jurors were confused, and wished plaintiff to prevail.

## II. DISCUSSION

Mrs. Stevens claims that there are four separate reasons why she should be granted a new trial; they are: 1) the verdict was against the weight of the evidence; 2) the jury received improper and prejudicial evidence; 3) I erred in charging the jury regarding intended use and misuse; and 4) there is competent evidence of jury error amounting to a miscarriage of justice.

In ruling on this motion, I have wide discretion in deciding whether to grant or refuse a new trial. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980). But I should grant the motion only if a new trial is required to prevent injustice or to correct a verdict that was against the weight of the evidence. *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 948 (3d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). Upon review of the record in this case, I find no basis for ordering a new trial.

### A. *Weight of the Evidence*

Mrs. Stevens makes the novel argument that the verdict must be set aside because the jury agreed with her that the plane was defective. She claims, as she did at trial, that if defects existed, then they must have contributed to the accident. In other words, she would have me follow the jury's logic with respect to defectiveness, but ignore it with respect to causation. Such a step would be an unwarranted invasion of the jury's province, especially where causation was debated as fiercely as it was in this trial.

The law requires that, in order to impose strict liability on a manufacturer of a product, a plaintiff must prove both that the product was defective, and that the defect proximately caused his injury. But Mrs. Stevens asks that I make an exception in her case, and find that a plaintiff need only meet the first prong of the test. If causation always followed from a finding of defectiveness, then the law would not insist on a dual determination by the jury. It is fruitless to ask why the jury did not decide that the plane's defect contributed to the crash; instead, we should merely consider whether there is sufficient evidence to support the verdict.

As discussed above, Cessna disputed that its product was defective. But it further contended that, if a defect were found, the defect could not have caused the Stevens disaster. Dr. Berry testified for quite some time on the issue of causation. Other witnesses testified as to Mr. Stevens' training, knowledge of proper pilot procedures, personal problems, state of mind before he took off, and behavior at Columbus Airport.

If the jurors chose to believe these witnesses, then they may well have concluded that pilot error caused the accident. They may have determined that Mr. Stevens, despite his training, reacted to his emergency in a way that could not have been foreseen—and thus not guarded against—by Cessna. They may have decided that through inattention or carelessness or panic, Mr. Stevens bypassed a safe landing and engaged in needlessly risky maneuvers. Cessna surely introduced sufficient evidence to support such findings, and it is not for me to second guess the jury's decision in light of the substantial evidence on which it could be based.

## B. *Admission of Evidence*

Mrs. Stevens objects to much of Dr. Berry's testimony and to references to Mr. Stevens' drinking on the night before his flight. She claims that any mention of alcohol was unduly prejudicial, and that the hearsay rule was violated through Dr. Berry's recounting of statements made to him during his investigation. I find that testimony on both points was properly admitted in the context of the situation.

### 1. *Alcohol Consumption*

■ As mentioned earlier, evidence of alcohol consumption was introduced for two purposes only: to show the stress on Mr. Stevens; and to support Cessna's suggestion that Mr. Stevens' perceptions may have been especially dull at the time of the accident. I issued a limiting instruction to the jury concerning the references to Mr. Stevens' drinking. Furthermore, I cautioned defense counsel to be careful not to dwell on the drinking issue and not to imply that Mr. Stevens may have been inebriated on the night of the crash. Counsel scrupulously followed this instruction, refraining from over-emphasizing the issue.

Furthermore, plaintiff's counsel, had sufficient opportunity to rebut the suggestion that alcohol may have affected Mr. Stevens' perception. He was able to bring before the jury the autopsy report finding of .0% alcohol in Mr. Stevens' blood. He also fully cross-examined Dr. Berry on the drinking question, eliciting from him the admission that he could not be certain that Mr. Stevens' sense of perception was at all altered by the drinking episode some 24 hours earlier.

Nonetheless, Dr. Berry did use the drinking episode as a factor in arriving at his medical opinion that pilot error caused the accident. Dr. Berry said that alcohol consumption was significant not simply because it may have residual effects on perception, but because it signified the pressure in Mr. Stevens' personal life. The doctor further testified that he—and others in his field—routinely relied on outward signs of stress (such as drinking) to evaluate whether pilots were fit to fly. Because this evidence is of the type normally relied upon by experts such as Dr. Berry, I find it admissible and not unduly prejudicial because of the accompanying limiting instruction. *See* Fed.R.Evid. 703.

### 2. *Hearsay Statements*

■ Dr. Berry, an expert with many years of experience in aeronautical medicine, undertook an investigation of Mr. Stevens' background. As part of this investigation, he interviewed many of Mr. Stevens' associates, such as his friends, coworkers, and professors. In his presentation to the jury, Dr. Berry explained that he believed that Mr. Stevens was under a great deal of stress—stress that might well have hampered his performance as a pilot. In fact, Dr. Berry concluded that Mr. Stevens was so preoccupied with personal problems—such as his relationship with Ms. Graham, financial troubles, and difficulties at school—that he was not in top shape to fly an airplane.

During his testimony, Dr. Berry made reference to what he had learned from those whom he had interviewed. Mrs. Stevens correctly points out that such testimony would normally be excludable hearsay. In this case, however, I allowed the testimony to proceed on the grounds that such statements were routinely relied upon by experts such as Dr. Berry. Rule 703 au-

thorizes the introduction of otherwise inadmissible evidence if it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Based on his many years of experience, Dr. Berry said that interviews such as those he conducted would normally be relied upon by those evaluating the fitness of pilots. Furthermore, Dr. Berry substantiated his recounting of the out-of-court statements through his tape recordings of the interviews.[2] Once more, I find that this evidence was properly admitted in accordance with Rule 703.

### C. *Charge to the Jury*

■ Mrs. Stevens complains that my charge misstated Pennsylvania law concerning misuse as a defense in a strict liability action. She acknowledges, however, that misuse is an issue in the case, for she herself submitted points for charge on this topic. Also, as already discussed, Cessna produced a great deal of evidence which suggested that unforeseeable pilot error caused the crash. There is thus no dispute that a charge on the subject of misuse was called for. The only issue is the proper wording of this charge.

Pennsylvania law is clear that "a finding of defect may be precluded when the plaintiff is injured when using the product in an 'abnormal' manner." *Burch v. Sears, Roebuck and Co.*, 320 Pa.Super. 444, 452, 467 A.2d 615, 619 (1983). "An allegedly abnormal use will negate liability, however, only if it was not reasonably foreseeable by the seller." *Id.* The jury should, therefore, be told that a product must be safe for both its intended use and any other reasonably foreseeable use. Furthermore, the jury should know that misuse is a defense to liability. My charge correctly included both of these elements. I declined to charge, as suggested by Mrs. Stevens, that Cessna could be excused from liability only

if Mr. Stevens' actions were "completely unforeseeable." I rejected this language because it does not comport with Pennsylvania law, and I properly charged that the standard to be applied was reasonably foreseeable use.

### D. *Jury Error*

■ Mrs. Stevens claims that a new trial is warranted because of juror confusion about the legal significance of their answers to the interrogatories. But Federal Rule of Evidence 606(b) expressly prohibits a juror from testifying "as to any matter or statement occuring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith." Mrs. Stevens has cited no case in which a new trial has been granted on the basis of juror testimony about confusion in the jury room. In fact, courts have expressly refused to grant such requests, and have instead regarded jury deliberations as private matters beyond the scope of review. *See, e.g., United States v. Chereton*, 309 F.2d 197 (6th Cir.1962) (affidavit of four jurors concerning confusion insufficient to impeach verdict). And in a situation quite similar to our own, another court in this district refused to set aside a verdict despite a juror's affidavit of confusion concerning interrogatories: "A juror cannot impeach his verdict by testifying that he was mistaken as to what verdict would be entered on the basis of his answers to interrogatories." *McNulty v. Borden, Inc.*, 542 F.Supp. 655, 658 (E.D.Pa. 1982). In light of these decisions and of the clear language of Rule 606(b), I find no merit to plaintiff's claim.[3]

### III. CONCLUSION

After careful review of the record and of the submissions by counsel, I find that the

---

2. The tapes themselves were, of course, not admitted. They merely served to corroborate Dr. Berry's testimony.

3. I also wish to point out that plaintiff's counsel had ample notice of the wording of the interrogatories, and had an opportunity in his closing to make clear to the jurors the legal significance of their answers.

verdict was supported by sufficient evidence and that no prejudicial error occurred during the course of or after the trial.