557 A.2d 372

Glenda C. WALTON, As Administratrix Of The Estate Of Dennis Earl McCracken and Glenda D. McCracken and Dana Marie McCracken, Minors, by Glenda C. Walton, their Parent and Natural Guardian, Appellant

v.

AVCO CORP., Summa Corp., and Executive Helicopters, Inc. (Three Cases).

Maeburl TINCHER As Administratrix Of The Estate of Billy James Tincher, James Barry Tincher, Larry Bill Tincher, Kristie Leann Tincher, and Gregory Wayne Tincher by their Parent and Natural Guardian, and Maeburl Tincher In Her Own Right, Appellants,

v.

AVCO CORP., Summa Corp. and Executive Helicopters, Inc. (Two Cases).

Appeal of AVCO CORPORATION.

Appeal of SUMMA CORPORATION. (Two Cases).

Superior Court of Pennsylvania.

Argued Aug. 31, 1988.

Filed March 28, 1989.

520

Craig A. Smith, Newtown, for Walton, appellant in Nos. 2274, 2275, and appellees in Nos. 2276–2278.

Brenda M. Flock, Philadelphia, for Avco, appellant in No. 2277, and appellee in No. 2274.

J. Bruce McKissock, Philadelphia, for Summa, appellant in Nos. 2276, 2278, and appellee in Nos. 2274, 2275, 2277.

Before CAVANAUGH, BROSKY and MONTEMURO, JJ.

MONTEMURO, Judge:

This case is based upon a tragic event and brings to this Court a series of novel issues in the area of strict products liability. On September 1, 1978, Dennis Earl McCracken was piloting a helicopter near Robbinsville, North Carolina. McCracken was ferrying a passenger, Billy James Tincher, who was an employee of the owner of the helicopter, Phillips and Jordan, Inc. The helicopter had been designed, manufactured and sold by Hughes Helicopter, Inc. (Hughes), a division of Summa Corporation. Hughes[1] had incorporated an engine manufactured by the Avco Corporation (Avco) into the helicopter. Sadly, both McCracken and Tincher lost their lives when the engine in the helicopter seized in mid-flight, causing the aircraft to fall and crash. A subsequent investigation revealed that the accident had occurred due to the failure of an oil pump which was a component of the engine manufactured by Avco.

In November of 1980, complaints were filed against both Avco and Hughes[2] by Glenda C. Walton, as Administratrix of the Estate of Dennis Earl McCracken and Glenda D. McCracken and Dana Marie McCracken, minors, by Glenda C. Walton, their parent and natural guardian, (hereinafter "Waltons"), and by Maeburl Tincher, as Administratrix of the Estate of Billy James Tincher, and James Barry Tincher, Larry Bill Tincher, Kristie Leann Tincher, and Gregory Wayne Tincher, minors, by Maeburl Tincher, their parent and natural guardian, and by Maeburl Tincher in her own right, (hereinafter "Tinchers"). After extensive pretrial

1. Although Summa Corporation is the named defendant in this appeal, we have referred to Summa Corporation as "Hughes" throughout this Opinion. Hughes Helicopter is the specific division of Summa Corporation which manufactured the aircraft piloted by Dennis Earl McCracken on September 1, 1978.

2. Although Executive Helicopters was originally listed as a defendant in this case, our review of the record indicates that the trial court dismissed the complaint against Executive Helicopters by an order dated March 30, 1982, for lack of personal jurisdiction.

proceedings, the cases were consolidated for trial in the Philadelphia Court of Common Pleas in September of 1985. Although the suits against Avco and Hughes were originally brought on a number of legal theories, the case was ultimately submitted to the jury on strict products liability theories alone. The jury, finding both Avco and Hughes strictly liable, awarded $891,203.00 to the Waltons and $415,902.00 to the Tinchers. Numerous post-trial motions were filed on behalf of the parties involved in this litigation in November of 1985. The trial court resolved these post-trial motions in a series of orders entered on July 16, 1987. This appeal followed.[3]

There is no dispute in the present case concerning the claim by the Waltons and the Tinchers, and the subsequent jury finding, that the engine manufactured by Avco was a defective product under Section 402A of the RESTATEMENT (Second) OF TORTS.[4] It is also undisputed that

3. In a Stipulation for Consolidation filed with the Prothonotary of the Superior Court on December 11, 1987, all parties stipulated and agreed that each of the five appeals filed as a result of the trial court's orders in July, 1987, would be consolidated on appeal, with Hughes designated as the lead appellant.

4. § 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for the physical harm thereby caused to the ultimate user or consumer, or to his property, if
    (a) the seller is engaged in the business of selling such a product, and
    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
    (a) the seller has exercised all possible care in the preparation and sale of his product, and
    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
See Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966) (§ 402A adopted as the law of Pennsylvania).
In the instant case, the oil pump in McCracken's helicopter engine was comprised of two gears or "impellers." The impellers were affixed to shafts which were inserted into a portion of the engine known as the "accessory case housing." Around this entire assemblage fit the "oil pump body." Oil was flushed through the assemblage and the rotating impellers in the confined space forced oil to be

when Avco became aware of the defective construction of its engine, it issued Service Instruction 1341 on July 30, 1976. This service instruction advised of the specific defect in the Avco engine which eventually caused the crash of the McCracken helicopter and detailed a procedure whereby this specific defect could be remedied.[5] Avco listed the time for compliance with Service Instruction 1341 as the next overhaul of the aircraft. Hughes received service instructions from Avco. Unfortunately, Hughes never forwarded or advised Phillips and Jordan, Inc. concerning the contents of Service Instruction 1341, nor did Hughes advise its authorized helicopter service centers about Service Instruction 1341. Phillips and Jordan, Inc. had the McCracken helicopter overhauled on September 14, 1977, thirteen and one half months *after* Avco had issued Service Instruction 1341. The overhaul was performed by Executive Helicopters, an authorized Hughes Service Center located in Atlanta, Georgia.[6] Due to the fact that Hughes had not advised Executive Helicopters of Service Instruction 1341, the defect in McCracken's helicopter engine was not remedied. *See supra* at n. 2.

In addition to determining that the Avco engine's defective design was a substantial contributing factor in causing the deaths of McCracken and Tincher, the jury in the instant case also determined that Hughes had failed to warn Phillips and Jordan, Inc. and Executive Helicopters of the engine's defective design and that this failure to warn was a substantial contributing factor in causing the untime-

expelled, thereby creating a necessary oil pressure in the aircraft's engine. The defect in this engine resulted from the fact that the accessory case housing had one "blind hole" (a hole which had no outlet) into which one of the impeller shafts was inserted. This particular impeller shaft began to pick up metal from the sides of the blind hole in which the shaft rotated. This process eventually caused the impeller shaft to break into pieces, resulting in a loss of oil pressure in the engine and a seizing of the engine.

5. Avco's Service Instruction 1341 called for a drilled oil passage from the face of the accessory case housing to the bottom of the "blind hole" to assure that the shaft received adequate lubrication.

6. Although Executive Helicopters, Inc. is an authorized Hughes Service Center, it is not a subsidiary of the Summa Corporation.

ly deaths of the two men. This brings us to the first issue which we will address in the appeal.

## POST-SALE FAILURE TO WARN OF DEFECTIVE COMPONENT PART

■ Following the trial, Hughes sought a judgment n.o.v., contending that it may not properly be held strictly liable for its failure to warn of the defective design of the Avco helicopter engine because "the issue of 'failure to warn' is addressed ... only when a product is designed and manufactured without defect, but nevertheless there are risks arising out of its *use* which require instructional warnings to make the use safe." Brief for Hughes at 20. At trial, Hughes requested that the jury be instructed that Hughes could only be found to be strictly liable for failure to warn or instruct if the Avco engine was *not otherwise defective.* We disagree with Hughes' construction of the strict products liability law of this Commonwealth. The trial court correctly concluded that Hughes, as the manufacturer of the helicopter, could be held strictly liable for the defective nature of the helicopter when it failed to warn of defects in the design of the helicopter's engine which were discovered and publicized after the sale of the aircraft.[7]

7. We note the following statements which Hughes has incorporated into its appellate brief:

> At the outset this Court should be aware that the dispute here is the ultimate allocation of liability between Avco and Hughes. Hughes does not seek, in any way, to remove parties in the chain of distribution from being available to respond to claims by injured parties; those parties will still be able to recover from anyone in the chain of distribution, should the original design/manufacturing entity go out of existence or be otherwise unable to respond to a damage award.

Brief for Hughes at 14, n. 1.

It is a firmly established legal principle that the term "seller" in Section 402A of the Restatement (Second) of Torts is "used generically to include all suppliers of products." *Walasavage v. Marinelli,* 334 Pa.Super. 396, 405, 483 A.2d 509, 513 (1984) (citing *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975)). All the suppliers of a defective product in the chain of distribution, "... whether retailers, partmakers, assemblers, owners, sellers, lessors, or any other relevant category", are subject to strict liability when the

■ "As between an innocent user of a product and a manufacturer or seller who is engaged in the business of manufacturing or selling a product, risk of loss for injuries resulting from the use of the product shall be borne by the manufacturer and/or seller." *Majdic v. Cincinnati Machine Company*, 370 Pa.Super. 611, 617, 537 A.2d 334, 337 (1988) (*en banc*). The test for determining whether or not a product has reached the hands of the user or consumer in a "defective condition" is whether the product is "equipped with every element necessary to make it safe for use." *Id.*, 370 Pa.Superior Ct. at 623, 537 A.2d at 340. It is by now settled that a product may be rendered defective because it lacks necessary warnings or instructions which the seller should have supplied but neglected to do so. In *Berkebile v. Brantly Helicopter Corporation*, 462 Pa. 83, 337 A.2d 893 (1975), the then Chief Justice Jones, writing the plurality opinion for the Court, opined:

> A "defective condition" is not limited to defects in design or manufacture. The seller must provide with the product every element necessary to make it safe for use. One such element may be warnings and/or instructions concerning use of the product. A seller must give such warnings and instructions as are required to inform the user or consumer of the possible risks and inherent limitations of his product. Restatement (Second) of Torts § 402A, comment h. If the product is defective absent

ultimate user of the product is injured as a consequence of the product's defect. *Burch v. Sears, Roebuck and Co.*, 320 Pa.Super. 444, 456, 467 A.2d 615, 621 (1983). *See also Dickerson v. Brind Truck Leasing*, 362 Pa.Super. 341, 524 A.2d 908 (1987); *Walasavage v. Marinelli, supra.* Although Hughes correctly recognizes that it may be subject to strict products liability solely because it was a link in the chain of distribution which placed a defective product into the marketplace, Hughes was not ultimately held strictly liable on this "chain of distribution" theory. Instead, the jury determined that Hughes had sold a defective product because Hughes' helicopter lacked an element which the aircraft needed to render it safe for its intended use. The critical, missing element was post-sale warnings detailing the need for modification of the helicopter engine at the next service overhaul of the aircraft. Due to the fact that this is the theory upon which Hughes was held to be strictly liable by the trier of fact, this theory of strict products liability may appropriately be addressed on appeal.

such warnings, and the defect is a proximate cause of the plaintiff's injury, the seller is strictly liable without proof of negligence ... Where warnings or instructions are required to make a product non-defective, it is the duty of the manufacturer to provide such warnings in a form that will reach the ultimate consumer and inform of the risks and inherent limits of the product. The duty to provide a non-defective product is non-delegable....

*Id.*, 462 Pa. at 100–103, 337 A.2d at 902–903 (citations omitted). In *Dambacher By Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408 (1984), this Court stated that in an inadequate warnings case, which is based upon strict products liability, "... the jury ... is to consider whether the product was safe in the absence of warnings or in light of the warnings that were given." *Id.*, 336 Pa.Superior Ct. at 57, 485 A.2d at 426.

In view of the evidence before the jury in the present case, we have no difficulty in concluding that the jury could, without legal error, impose strict liability upon Hughes. The fact that Avco was also found to be strictly liable because it designed, manufactured, and sold a defectively designed helicopter engine does not preclude a finding that Hughes was also strictly liable. It is quite clear that the jury found Hughes to be the supplier of a defective product because, apart from being in the chain of distribution of a defective component part, Hughes had sold its own product—a Hughes helicopter—without adequate warnings concerning its design and safety for consumer use. Hughes had been notified of the defect in the design of the Avco engine but, nevertheless, failed to issue warnings and service instructions to persons who had previously purchased a Hughes helicopter and were presumably flying it. In addition, Hughes failed to distribute Avco's Service Instruction 1341 to its authorized helicopter service centers. The idea that a product supplier can face strict liability for events which transpire subsequent to the sale of his product is not novel in this Commonwealth. In *Majdic v. Cincinnati Machine Co., supra,* the appellant, Henry Majdic, was

injured while operating a power press which had been designed, manufactured, and sold by Cincinnati Machine Company. Majdic commenced an action against Cincinnati Machine to recover for his injuries which was ultimately tried solely on a strict liability theory. During the trial, Cincinnati Machine conceded that it had been aware of the hazards associated with the use of the power press but argued that because its power press was incorporated as a component part of a larger metal forming system by Majdic's employer, National Standard, it was National Standard's obligation to provide necessary safety features and warnings consistent with the use it made of the power press. This Court disagreed with the contentions advanced by Cincinnati Machine and recognized the following:

> Although Cincinnati may have indeed expected its buyers to correct any safety hazards associated with the power press once it was consolidated within their manufacturing systems, *a manufacturer's duty to warn of the dangers may nevertheless continue when it becomes cognizant that its buyers are not making the necessary safety adjustments to its product.* It would be a question of fact for the jury to determine whether the product was safe absent sufficient instructions to its purchasers that safety guards and warnings should be attached to the power press upon implementation into a larger metal forming system.

*Id.* 370 Pa.Super. at 625, 537 A.2d at 341.

Most jurisdictions which have considered the post-sale obligations of a manufacturer/seller have been willing to impose a post-sale duty to warn.[8] *See* Allee, *Post–Sale*

---

8. We have recognized that the use of the term "duty" in the context of strict products liability may be misleading or confusing because "duty" is a negligence concept. *See Carrecter v. Colson Equipment Co.,* 346 Pa.Super. 95, 102 n. 8, 499 A.2d 326 330 n. 8 (1985). However, we have chosen to speak in terms of Hughes' "post-sale duty to warn" in the present case because of the use of this terminology in the *Majdic* opinion and, more importantly, because we are recognizing in Hughes an affirmative obligation *to act* upon information received following the sale of its product. In employing this terminology, we reiterate that in a products liability case, the focus of the

*Obligations of Product Manufacturers*, 12 Fordham Urb. L.J. 625 (1984) (collecting cases); and Royal, *Post Sale Warnings: A Review and Analysis Seeking Fair Compensation Under Uniform Law*, 33 Drake L.Rev. 817 (1983) (collecting cases).[9] The first case which marked the path to the recognition of a post-sale duty to warn of product defects was *Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959). *Comstock* involved defects in the power brakes of 1953 Buick automobiles. General Motors was aware of the defect and sent written notice of the problem to dealers in November of 1953. No notice was sent to car purchasers. Plaintiff Robert Comstock was seriously injured when he was struck by a 1953 Buick car after the brakes in the car failed to operate. The *Comstock* Court stated, "[w]e believe a ... duty to give prompt warning exists when a latent defect which makes the product hazardous to life becomes known to the manufacturer shortly after the product has been put on the market." *Id.*, 358 Mich. at 176, 99 N.W.2d at 634. The Court concluded that General Motors had been negligent because warnings to car owners could have "easily" prevented the plaintiff's injuries. *Id.* at 178, 99 N.W.2d at 635.

We have reviewed the development of case law in other jurisdictions following the *Comstock* decision. We note particularly the opinion of the Supreme Court of Wisconsin

court must remain on the safety of the product and not upon the reasonableness of the defendant's conduct.

9. The following hypothetical, not unlike the tragic reality of the case at bar, appears as an introduction in Mr. Robert A. Royal's law review article, which addresses in depth the duty of a seller to warn previous purchasers of its product of defects or hazards in the product discovered for the first time post-sale:

John purchased his motorcycle two years ago. While riding the motorcycle down a hilly country road, the throttle stuck, preventing him from slowing down. He crashed and was severely injured. After the accident John discovered that one year after he purchased his model the manufacturer of the motorcycle discovered a problem with the throttle sticking open on his type of motorcycle. A change in design corrected the problem in the newer models. John muttered to himself. "If only I would have known."

Royal, *Post Sale Warnings: A Review and Analysis Seeking Fair Compensation Under Uniform Law*, 33 Drake L.Rev. 817, 817 (1984).

in *Kozlowski v. John E. Smith's Sons Company*, 87 Wis.2d 882, 275 N.W.2d 915 (1979), which we believe presents a factual background similar to the case at bar. Andrew Kozlowski was killed in an industrial accident when he inhaled ammonia while cleaning a sausage stuffing machine. The Wisconsin Supreme Court reversed the directed verdict which had been entered in favor of manufacturer of the machine. As in the case presently before this Court, one theory of liability in *Kozlowski* was strict products liability under Section 402A of the RESTATEMENT (Second) OF TORTS.[10] The question concerning a post-sale duty to warn by the manufacturer of the sausage stuffing machine, Smith, arose because after the sale of the machine to Kozlowski's employer, Smith developed a safety by-pass valve which later became standard on all of Smith's sausage stuffing machines. Incorporation of this by-pass valve would have presumably prevented the accident which resulted in Kozlowski's death. Whether there could be a continuing duty on the part of Smith to issue safety warnings to the users of its machine was characterized by the Wisconsin Supreme Court as "the most troublesome aspect of th[e] case." *Id.* 87 Wis.2d at 900, 275 N.W.2d at 923. The Court held that a continuing duty to warn could be charged to Smith but, in so doing, the Court was careful to limit its holding to the particular facts before it:

The sale of the sausage stuffer is to a limited market wherein the manufacturer should know of all companies that own its product. Therefore, whether based upon a theory of strict liability in tort or a common law duty, a jury could find it persuasive that prior to the accident, a Smith's sales representative made only two visits to the Cudahy plant [where Kozlowski was employed]. On each occasion he failed for one reason or another to inform Cudahy of the safety by-pass valve and the hazard it was designed to prevent. The representative's own testimony

---

**10.** In addition to strict products liability, the *Kozlowski* Court reversed the entry of a directed verdict in favor of the defendant on common law negligence theories which had been advanced by the plaintiff in that case.

is that these sales calls were made after 1971 when the safety by-pass valve had become standard equipment on all new machines.

We do not in this decision hold that there is an absolute continuing duty, year after year, for all manufacturers to warn of a new safety device which eliminates potential hazards. A sausage stuffer and the nature of that industry bears no similarity to the realities of manufacturing and marketing household goods such as fans, snowblowers or lawn mowers which have become increasingly hazard proof with each succeeding model. It is beyond reason and good judgment to hold a manufacturer responsible for a duty of annually warning of safety hazards on household items, mass produced and used in every American home, when the product is 6 to 35 years old and outdated by some 20 newer models equipped with every imaginable safety innovation known in the state of art. It would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period.

*Id.* at 900–901, 275 N.W.2d at 923–924.

In reaching our decision that Hughes may be held strictly liable for its failure to issue post-sale warnings about the safety of the engine it had installed in its helicopters, we are cognizant of the nature of the helicopter manufacturing industry. A helicopter is not a household good, commonly found in almost any home in this country. It is, instead, a unique and costly product which is manufactured, marketed, and sold to a specialized group of consumers. We believe that Hughes could have communicated safety information and service instructions with relative ease by contacting purchasers of its helicopters, as well as authorized Hughes service centers, through the mail or otherwise. Certainly, product repair and maintenance businesses represent a convenient contact point between a product supplier and a product owner. Our tort law should encourage product suppliers such as Hughes to develop systems of

identifying product owners and their locations. Suppliers should be capable of formulating procedures to update these product owner lists at appropriate intervals. When Hughes was advised of the defect in Avco's engine, it certainly had the technical knowledge and the experience to understand the significance of that information. We are not as willing to believe that owners of Hughes' helicopters would possess the same level of technical knowledge. Moreover, even if a particular consumer has advanced technical education or training, the consumer of a Hughes helicopter will not have access to the kind of information which Hughes received from Avco in this case. The consumer is not a part of the industry's communication network which continually allows Hughes to receive product safety information and instructions from its component part manufacturers. A consumer, from which Hughes has derived its profits, has a right to rely on Hughes to warn him when Hughes learns that its helicopter is not safe, as originally sold, for continued use an aircraft. Simply stated, Hughes had the superior position and the know-how to receive, comprehend, and disseminate information regarding the safety of its products. This is why Hughes may be held strictly liable for the damages which have resulted from the deaths of McCracken and Tincher.

Many issues regarding a manufacturer's post-sale duty to warn are not implicated and thus are not answered by our decision here. We leave for future cases the task of formulating the boundaries of a product manufacturer's post-sale legal obligations. We are convinced, however, that boundaries must indeed be recognized. Strict products liability is justified by the belief that it encourages manufacturers and sellers to provide the public with safe products. In order for post-sale strict products liability to achieve this goal, we should be aware that, with the recognition of a legal duty, there must also be a means whereby a manufacturer may effectively discharge or satisfy this duty. If the manufacturer or seller of a product perceives no way of *reasonably* discharging a legal duty, he will undoubtedly experience a decline in his incentive to provide

the kind of safety instructions and safe products which we would all like to see in the stream of commerce. *See* Schwartz, *The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine*, 58 N.Y.U. Law Review 902 (1983). We believe that our courts will have an opportunity to define the boundaries of the post-sale duties in the first instance by following the precedent set by our supreme court in *Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978). In *Dambacher by Dambacher, supra,* this Court stated that:

> In *Berkebile* the Chief Justice had explained that the term "unreasonably dangerous", as used in Section 402A, does *not* import negligence principles into a strict liability case. In *Azzarello* the Court further decided ... that what the term "unreasonably dangerous" *does* do is to impose on the trial court the responsibility of deciding, as a matter of law and by resolving considerations of "social policy", whether "the risk of loss should be placed upon the supplier." ... Emphasizing its previous decisions that the supplier's liability is that of a guarantor, not an insurer, the Court went on to outline a jury instruction for use "in products liability cases in this Commonwealth," ...

*Id.* 336 Pa.Super. at 56, 485 A.2d at 426.

The social policy that seeks to compensate those who have been injured because of a product defect is a strong and valued policy in this Commonwealth. Also important is the social policy that assures to product manufacturers and sellers that they will not become the effective insurers of their products. In our desire to compensate the persons who have been injured by defective products, we should not be willing to impose upon product suppliers legal duties that are unreasonable, and therefore, effectively unobtainable. If we resort to this path, we will win some battles in the short run, but we will, in the final analysis, lose the war.[11]

11. We note that some courts have been willing to broadly construe the post-sale obligations of product suppliers. In *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.1979), Bell, the helicopter manufacturer, discovered that its helicopter tail rotor blades could fail

## INDEMNIFICATION

■ Hughes, citing *Burch v. Sears, Roebuck and Co.,* 320 Pa.Super. 444, 467 A.2d 615 (1983), argues that it should have been granted a judgment n.o.v. because it is entitled to receive indemnification from Avco. We disagree and affirm the trial court's disposition of this issue.

Our supreme court has recently discussed the concept of common law indemnity in Pennsylvania:

> ... unlike comparative negligence and contribution, the common law right of indemnity is not a fault sharing mechanism between one who was predominantly responsible for an accident and one whose negligence was relatively minor. Rather, it is a fault shifting mechanism, operable only when a defendant who has been liable to a plaintiff solely by operation of law, seeks to recover his loss from a defendant who was *actually responsible* for the accident which occasioned the loss.

*Sirianni v. Nugent Bros., Inc.,* 509 Pa. 564, 570–571, 506 A.2d 868, 871 (1986) (emphasis added). Where a party

in flight if owners and users of the helicopter had not complied with all maintenance procedures. Bell later developed a tail rotor blade which was safer because it required less continual maintenance. Bell informed all owners and its service centers of the availability of this new part. The Court held that, given the fact that Bell had assumed the duty to improve the safety of this component part of its helicopter, "Bell had an obligation to complete the remedy by using reasonable means available to it *to cause replacement* of [the blades] ..." *Id.* 594 S.W.2d at 532 (emphasis added). In *Gracyalny v. Westinghouse Electric Corp.,* 723 F.2d 1311 (7th Cir.1983), employees of the Wisconsin Public Service Corporation (WPS) were severely burned when a circuit breaker sold by Westinghouse exploded. Fifteen years prior to this accident, Westinghouse sent a letter to WPS detailing the design defect in its circuit breaker and offering free baffles which could be installed to correct the defect. Westinghouse provided WPS with baffles but WPS failed to install all of them. The accident which injured the WPS employees occurred at a site where WPS had failed to install baffles. The United States Court of Appeals for the Seventh Circuit reversed summary judgment in favor of Westinghouse, stating that a jury could find that "... Westinghouse was negligent in failing to follow up its warning letter ... with another letter or a personal visit by a sales representative to WPS offices ... And given the serious nature of a circuit breaker malfunction, a jury could determine that Westinghouse itself *should have undertaken to install* the baffles." *Id.* at 1321 (emphasis added).

seeks indemnity, the issue is whether that party "had *any part* in causing the injury." *Id.* Hughes has not established a legally recognizable claim for indemnity against Avco because Hughes is not merely liable to the plaintiffs by operation of the law. On the contrary, Hughes' liability is grounded on its own "active fault": failure to issue post-sale warnings concerning the defective nature of its product. As was said in *Builders Supply Co. v. McCabe,* 366 Pa. 322, 328, 77 A.2d 368, 371 (1951):

> In a case of concurrent or joint tortfeasors, having no legal relation to one another, each of them owing the same duty to the injured party, and involved in an accident in which the injury occurs, there is complete unanimity among the authorities everywhere that no right of indemnity exists on behalf of either against the other; in such a case, there is only a common liability and not a primary and secondary one, even though one may have been very much more negligent than the other.

In the context of a products liability case, this Court has recognized that in determining "... who may be ... required to indemnify ... courts have evaluated the facts in light of products liability policies, particularly by focusing on opportunity to discover or actual knowledge of the defective condition and on the relative burdens of correcting or preventing the defect." *Burch, supra* 320 Pa.Super. at 458–459, 467 A.2d at 623. In *Burch,* this Court cited Section 93(1) from the RESTATEMENT OF RESTITUTION which addresses indemnity in a chain of distribution case:

> Where a person has supplied to another a chattel which because of the supplier's negligence or other fault is dangerously defective for the use for which it is supplied and both have become liable in that to a third person injured by such use, the supplier is under a duty to indemnify the other for expenditures properly made in discharge of the claim of the third person, if the other used or disposed of the chattel in reliance upon the supplier's case and if, as between the two, such reliance was justified.

*Id.*, 320 Pa.Superior Ct. at 458, 467 A.2d at 622. The *Burch* Court affirmed a verdict awarding indemnity to the *non-manufacturer* retailer, Sears, from General Electric. General Electric had supplied defective electrical systems to a non-party, the Roper Corporation, which incorporated the electrical systems into its electric lawn mowers. The Roper Corporation designed, tested and assembled the mowers but General Electric shared responsibility for safety features in the electrical systems. Sears marketed and sold the mower but, in stark contrast to the facts of the instant case, Sears did not control the design of the mower, did not manufacture the mower, and did not have the expertise to evaluate its safety. Under the circumstances of that case, this Court determined that Sears had "justifiably rel[ied] on its suppliers." *Id.*, 320 Pa.Superior Ct. at 460, 467 A.2d at 624. In the present case, Hughes cannot establish that it justifiably relied upon Avco because Avco acknowledged the defect in its engine and warned Hughes accordingly. Moreover, Hughes is not simply a seller of the helicopter; Hughes is the manufacturer of the helicopter. This is not a case where "community opinion would consider that in justice the responsibility should rest upon one defendant rather than the other." W. Prosser, *Law of Torts* at 313 (4th ed. 1971).

## AVCO'S CLAIM FOR CONTRIBUTION

■ On June 4, 1984, Avco and the Walton and Tincher plaintiffs executed a settlement agreement which was entitled as follows: "Contingent Joint Tortfeasor Release and Indemnity Agreement." Avco settled the Walton action for $922,355.00 and the Tincher action for $1,000,000.00. Both settlement figures exceeded the ultimate jury award which was entered against both Avco and Hughes: $891,203.00 to the Waltons and $415,902.00 to the Tinchers.[12] Relevant portions of the Walton release agreement follow:

12. Questions of contribution as to the Tincher verdict will not be addressed herein because, as the trial court properly recognized, the amount of damages due to the Tinchers is not final. The Tincher's motion for a limited new trial on a single damages issue was granted

... It is further understood and agreed and it is the express intent of the parties to this agreement that this release shall not in any way affect the rights of Avco ... to pursue claims for contribution and/or indemnity arising out of the same accident against Summa Corporation and/or Executive Helicopters, Inc. of Atlanta, Georgia.

IT IS FURTHER UNDERSTOOD AND AGREED, however, that if it should be determined that any person, firm or corporation not being released by the terms of this release is jointly or severally liable to the claimants with any party herein released, in tort or otherwise, the claim against and damages recoverable from such other person, firm or corporation shall be reduced by the greater of the amounts determined as follows:

    a. The amount of the consideration paid for this release; or

    b. The amount determined by the sum of the prorata share of legal responsibility or legal liability for which the parties herein released are found to be liable as a consequence of the aforesaid accident of September 1, 1978.

R.R. at 44a.

The trial court granted Avco's post-trial motion seeking contribution from Hughes, and awarded Avco one-half of the jury verdict entered in favor of the Waltons: $445,-601.50.[13] In so doing, the trial court relied on the specific terms of the parties' release agreement as well as particular provisions of the Uniform Contribution Among Tortfeasors Act (U.C.A.T.A.), *See* 42 Pa.C.S.A. §§ 8321 to 8327. We find that, as to the Walton plaintiffs, Avco is entitled to contribution from Hughes. The Walton plaintiffs claim that Avco is not entitled to receive any contribution from

by the trial court and we have affirmed this grant of a limited new trial.

**13.** In this section of our opinion, we will not address the question of whether the trial court correctly computed the *amount* of Avco's recovery from Hughes. This issue will be addressed after we have resolved the question of whether Avco has the right to recover contribution from Hughes in any amount.

Hughes because, relying on the opinion of our supreme court in *Charles v. Giant Eagle Markets*, 513 Pa. 474, 522 A.2d 1 (1987), the Waltons believe that they are entitled to recover from Hughes the full amount of Hughes' share of the jury verdict. We have carefully reviewed the *Charles* decision and we are convinced that it does not provide the relief the Waltons seek.

Under the U.C.A.T.A, a tortfeasor has a right to contribution from a joint tortfeasor where he has by payment discharged the common liability or has paid more than his pro rata share thereof. 42 Pa.C.S.A. § 8324(b).[14] In *Charles*, the appellant, George Charles ("Charles"), instituted suit against Giant Eagle Markets, Inc. ("Giant Eagle") after he fell near the entrance to one of Giant Eagle's retail stores. Giant Eagle joined Stanley Magic Door, Inc. ("Stanley") as an additional defendant. Prior to trial, Giant Eagle and Charles executed a settlement agreement which contained the following provision:

> ... I [Charles] further agree that any recovery that I may obtain against any ... corporation other than Giant Eagle Markets, Inc. ... shall be reduced to the extent of the pro rata share of ... Giant Eagle.

*Id.*, 513 Pa. at 482, 522 A.2d at 5. The jury returned a verdict in favor of Charles in the amount of $31,000.00. The jury found Giant Eagle to be sixty percent negligent and Stanley to be forty percent negligent. Stanley paid only $8,500.00 to Charles, taking the position that Charles was only entitled to receive the amount of the jury verdict minus the settlement payment it had already received from Giant Eagle. The Supreme Court reversed and ordered

14. § 8324. Right of contribution

(a) General rule.—The right of contribution exists among joint tortfeasors.

(b) Payment required.—A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.

(c) Effect of settlement.—A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement.

Stanley to pay the full amount of its proportionate share of the jury verdict to Charles: $12,400.00. In reaching this conclusion, the *Charles* Court recognized that "[t]he responsibility of the settling tortfeasor should be finally resolved by the terms of the settlement" and that "[t]he obligations of the remaining defendants ... are determined by the verdict." *Id.*, 513 Pa. at 478–479, 522 A.2d at 3. The Supreme Court reasoned as follows:

> ... where a release has been executed, the verdict is reduced only by the proportionate share of the settling tortfeasor. The actual amount of the release, if it exceeds this sum, is of no consequence in the satisfaction of the judgment of the remaining defendants. The fact that the plaintiff may receive a larger dollar amount in damages than that fixed by the jury does not militate against such an approach.

*Id.*[15] The Court cited the following language from the Supreme Court of Colorado as a statement of the policy considerations underlying its holding in *Charles:*

> ... If the plaintiff knew that any settlement reached would be deducted from the proportionate share owed to the plaintiff by another tortfeasor, the plaintiff would be less likely to settle. Similarly, tortfeasors might refuse to settle, hoping that their share of damages would be reduced by the settlement amount paid by another tortfeasor.

*Id.* (citation omitted).

The *Charles* Court concluded that its holding was consistent with not only the Comparative Negligence Statute, 42 Pa.C.S.A. § 7102, but also with the U.C.A.T.A. The Court dismissed any claim of contribution on the part of Stanley because Stanley had not "been required to pay *'more than'*

---

**15.** The Supreme Court in *Charles* espoused its view that there is no basis for concluding that a jury verdict more accurately measures a tortfeasor's obligation than that which is agreed upon between the parties by way of settlement. Thus, the Court determined that "there is no basis for concluding that the jury verdict must serve as a cap on the total recovery that a plaintiff may receive." *Charles, supra,* 513 Pa. at 478, 522 A.2d at 3.

the pro-rata share." 42 Pa.C.S.A. § 8324(b). Further, Giant Eagle had no viable claim for contribution because Giant Eagle had "elected to pay the consideration for the release to avoid further involvement in the lawsuit." *Id.*, 513 Pa. at 480, 522 A.2d at 4. The Court found § 8326 of the U.C.A.T.A. to be compatible with its holding by employing the following analysis:

> Section 8326 of the UCATA provides:
>
>> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.
>
> 42 Pa.C.S.A. § 8326.
>
> This section affords the parties to the release an option to determine the amount or proportion by which the total claim shall be reduced provided that the total claim is greater that the consideration paid. In this instance the release specifically provided:
>
>> ... I further agree that any recovery that I may obtain against any ... corporation other than Giant Eagle Markets, Inc. ... shall be reduced to the extent of the pro rata share of ... Giant Eagle.
>
> We find no inconsistency with the UCATA, given the clear language of both that statute and the release executed by Charles and Giant Eagle, in reducing the jury's verdict by Giant Eagle's proportionate share of the damages ...

*Id.*, 513 Pa. at 481–482, 522 A.2d at 4–5.

Unlike the settling tortfeasor in *Charles*, the settling tortfeasor here, Avco, did not pay consideration to the plaintiffs to be released *unconditionally* from further involvement in the lawsuit. On the contrary, Avco specifically provided in its release agreement with plaintiffs that its involvement in the lawsuit would continue in so far as Avco

retained the right to seek contribution. Avco conditioned its payment of the settlement monies on the basis that if had overestimated its own liability to the plaintiffs, it could remedy this mistake by pursuing its contribution rights against other liable parties. The terms of Avco's release agreement controls Avco's right to seek contribution from Hughes. Our result in this regard is simply unaffected by the *Charles* decision where the parties to the settlement agreement had merely provided that the total claim would be reduced by Giant Eagle's pro rata share of the jury verdict. Finally, apart from the terms of its release agreement with the plaintiffs, we believe that Avco's right to seek contribution can be said to arise from the operation of § 8324(b) of the U.C.A.T.A. Avco has, by paying plaintiffs a greater settlement amount than the jury awarded to the plaintiffs as damages, "discharged the common liability" of Avco and Hughes. *See* 42 Pa.C.S.A. § 8324(b). Our conclusion in this regard is of course based upon our finding that no part of Hughes' share of the jury verdict is owed to the plaintiffs.

In the present case, the plaintiffs agreed in the release they executed with Avco that any damages recovered from another defendant in the case (assuming this defendant and Avco were found to be jointly and severally liable) would be reduced by the greater of the consideration paid by Avco for its release or Avco's pro-rata share of the total damages awarded. The *Charles* Court recognized that 42 Pa.C.S.A. § 8326 provides an opportunity for the parties to determine, by way of their release and settlement contract, the effect that the release will have on the plaintiff's ability to recover damages at trial from other joint tortfeasors. *Charles, supra,* 513 Pa. at 482, 522 A.2d at 4. If the settlement amount exceeds the ultimate claim recovered at trial against all defendants, as in the instant case, then the parties executing a release agreement have no option as to the amount by which the judgment will be reduced. Under those circumstances, the judgment is essentially cancelled out by the previous settlement payment to the plaintiff. It

is where the consideration paid for the previous release agreement is less than the total claim ultimately recovered by the plaintiff at trial, as in *Charles,* that the parties to a release agreement have "the option to determine the amount or proportion by which the total claim shall be reduced." *Id.*

Our conclusion under the particular facts of the present case comports with the policy considerations announced by the Supreme Court in *Charles.* The plaintiff is encouraged to settle in view of the fact that he will recover at least the amount of the jury verdict entered against the joint defendants and perhaps a greater amount where the release consideration exceeds the total jury verdict. The nonsettling defendant, where the settling defendant has preserved the right to seek contribution, has no incentive to allow the case to go to trial in hopes of securing a windfall at the settling defendant's expense. The settling defendant, who protected his contribution rights, has appropriately reached an agreement which is satisfactory to the plaintiff and has at the same time protected his own interests in a fair and reasonable manner. In the final analysis, it is particularly difficult to accept the plaintiffs' claim to Hughes' share of the jury verdict because the plaintiffs' accepted and agreed to the clear terms of the release agreement they executed with Avco. We therefore uphold Avco's right to seek contribution from Hughes and we affirm the denial of plaintiffs' claim to receive a portion of the jury verdict from Hughes.

## COMPARATIVE CONTRIBUTION

■ Having determined that Avco may seek contribution from Hughes, we must now determine whether the damage award should be apportioned between these two defendants, both strictly liable, on an equal basis. Hughes contends that the trial court erred in not ordering a hearing so that the relative fault of Avco and Hughes could be determined and, in turn, their respective liabilities. Even though we

are faced with an issue of first impression in this Commonwealth, we are not writing on a clean slate.

█ In *Burch v. Sears, Roebuck and Co., supra,* this Court, while reiterating the well established rule that in our products liability law, all suppliers of a defective product in the chain of distribution are potentially liable to the ultimate user injured by the defect, stated:

> ... in a strict liability case all or several parties in the chain of distribution are held liable simply by a "rule of ... law." ... Such liability, however, does not preclude the possibility of one defendant being negligent or more responsible in fact, under the scheme of the relevant products liability law, than other suppliers....

*Id.* 320 Pa.Super. at 458 n. 4, 467 A.2d at 623 n. 4 (citations omitted). We agree that even though two defendants, defendants like Avco and Hughes, may be jointly and severally liable under strict products liability, this does not mean that, in fact, they are equally responsible for the harm which has resulted from a product defect. If we recognize that even in a strict liability case, comparative fault should be the rule of law for the apportionment of damages between defendants, we will aid the law in its effort to bring safer products to our consumers. The Supreme Court of Texas has aptly identified the following equitable and social considerations as implicit in the recognition of some form of comparative fault in strict products liability actions:

> ... strict products liability is not *absolute* liability—that is, product suppliers are not insurers of the safety of their products. On the other hand, "all or nothing" strict liability defenses are outmoded and undesirable doctrinal throwbacks resulting in unfairness to plaintiffs, to defendants, and to other product purchasers who ultimately absorb the loss through price setting.... In the absence of apportionment, some manufacturers bear the total expense of accidents for which others are partly to blame, while other manufacturers totally escape liability even though they have sold a defective product. Either result is unacceptable.

Unfairness, however, is not the only serious flaw of virtually ignoring plaintiff and third party misconduct in strict products liability actions. The failure to allocate accident costs in proportion to the parties' relative abilities to prevent or to reduce those costs is economically inefficient.... An ideal tort system should impose responsibility on the parties according to their abilities to prevent harm. Existing law, however, encourages manufacturers to make safety improvements that are not cost justified, while failing to deter the substandard conduct of other tortfeasors.... Thus, equitable and rational risk distribution, a fundamental policy underlying the imposition of strict products liability, logically depends on the existence of some system for comparing causation in cases involving plaintiff or third party misconduct.

*Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 424–425 (Tex.1984).

In *Svetz v. Land Tool Co.*, 355 Pa.Super. 230, 513 A.2d 403 (1986), this Court, in construing the U.C.A.T.A., held that contribution is available whenever two or more persons are jointly and severally liable in tort, irrespective of the fact that one defendant has been held to be liable in strict products liability and the other in negligence. In so holding, we made the following statements:

This result is not in conflict with the policy considerations which support strict liability for defective products. Strict liability was designed to benefit injured consumers ... It was designed to enhance consumer-plaintiff's chances of recovery by eliminating the burden of proving the manufacturer's negligence.... The focus of strict liability, therefore, must be upon the relationship existing between the plaintiff-consumer and the defendant-manufacturer ... the focus of the [U.C.A.T.A.], on the hand, is upon the relationship between tortfeasors after a determination has been made that they are jointly liable for plaintiff's injury. Thus, it is only after plaintiff's loss has been assessed against joint tortfeasors and the policy goals of strict liability have been satisfied that the Act

achieves significance. It then seeks to achieve an equitable apportionment of that loss among all tortfeasors who have contributed to the loss.

*Id.*, 355 Pa.Superior Ct. at 241–242, 513 A.2d at 409.

The decision of a panel of this Court in *McMeekin v. Harry M. Stevens*, 365 Pa.Super. 580, 530 A.2d 462 (1987) has taken the holding of *Svetz* a step further. In *McMeekin*, as in *Svetz*, one tortfeasor had been held liable in negligence and the other in strict products liability. The issue to be decided was whether in assessing contribution between a negligent and a strict liability tortfeasor, apportionment should be made in accordance with the number of tortfeasors ("pro rata") or on a "comparative fault" basis. The *McMeekin* Court, recognizing that contribution is rooted in equity, declared that "it would appear to be less than equitable to require a fifty-fifty apportionment when the facts, as determined by a jury, clearly established that one of the joint tortfeasors had greater responsibility for causing the harm than the other." *Id.* 365 Pa.Super. at 588, 530 A.2d at 466. The Court then determined that after a finding of liability against tortfeasors and an assessment of the total damages recoverable by the plaintiff, the jury can be asked, by way of special interrogatories, to assess the percentage of the damages attributable to the defect in the product and the share attributable to the negligent conduct of a joint tortfeasor.

While it is true that the concept of fault is irrelevant when determining whether strict liability may be imposed upon a tort defendant, it is not irrelevant when the liability phase of a trial is closed and the focus has shifted to the issue of contribution; to the question of how the defendants should share in the burden of paying the damages which have been assessed in favor of the plaintiff. The apportionment of liability between or among defendants is a task which equity must guide. In our view, the only equitable means to apportion liability between or among tort defendants is through a determination of their respective fault in causing the plaintiff's injuries. Our view is not affected by

the theory of liability which the plaintiff has successfully established against each of the defendants at trial.

We believe that the *McMeekin* Court, in recognizing that a comparative fault doctrine is applicable where strict products liability and negligence are the underlying theories of liability, set forth what may be more clearly identified as a "comparative causation" doctrine. Upon remand of the instant case, the trier of fact must compare the conduct of Avco and of Hughes to determine the percentage share of each in causing the deaths of McCracken and Tincher. In *Lewis v. Timco, Inc.*, 716 F.2d 1425 (5th Cir.1983), the Court held that notwithstanding the strict products liability theory of the case, comparative fault of the plaintiff would be applied to reduce the liability of the manufacturer of a defective product. We agree with the *Lewis* Court when it wrote: "The focus then is that when the jury compares fault the focus is upon causation. It is inevitable that a comparison of the conduct of plaintiffs and defendants [will] ultimately be in terms of causation. Fault that did not cause injury is not relevant." *Id.* at 1431. The dissenting members of the Court in *Lewis*, although not agreeing that fault and causation are the same thing, agreed with the conclusion that "if the plaintiff's actions are blameworthy and helped cause the result, an appropriate reduction in recovery would seem in order." *Id.* at 1438. Judge Politz, authoring the dissenting opinion, thoughtfully, and we believe accurately, recognized:

> The focus of the inquiry should be the causal relationship between the plaintiff's conduct and the injury ... There is nothing novel or unusual about using causation to gauge liability ... The civil law has long recognized causation as a basis for allocating responsibility ... Can the average fact-finder apportion causation? I think so. I am convinced that judges and juries would have no more difficulty determining causation than they do with culpability ...

*Id.*

We are also convinced that the trier of fact can employ a comparative causation doctrine when apportioning liability

between two strictly liable defendants such as Hughes and Avco.[16] We are cognizant of the fact that in a case which has been tried solely on a strict liability theory, sufficient evidence concerning the conduct of the defendants may not have been presented to the trier of fact in order for it to assess comparative causation. Under those circumstances, it will be necessary for the trial court to allow the parties to present additional evidence. The trial court must, of course, limit the scope of this additional hearing to evidence concerning the conduct of the defendants which has not previously been admitted and which bears directly on the issue of causation of the plaintiff's harm. In many product liability cases, the trial court may deem it unnecessary to grant an additional hearing because the evidence and testimony during the liability phase of the trial will have been extensive. In many product liability cases, theories of negligence, as well as strict liability theories, are tried in a single proceeding. In such cases, the trier of fact will likely have sufficient evidence concerning the conduct of each defendant, aside from the evidence which was presented to establish the defective condition of the product, to apportion liability for contribution purposes.

## THE TINCHERS' DAMAGES AWARD

The jury awarded to the Tinchers, *inter alia*, the following damages:

(a) Funeral Expenses.     $2,478.00

(b) Loss of services, society, comfort, work around the house, decedent would have provided *his* family (wife and children).     $43,428.00

(c) Loss of services decedent would have contributed as a father to his children including guidance, tutelage and moral upbringing.     $50,000.00

The trial court, in response to post-trial motions filed by the Tinchers, awarded the Tinchers a new trial on the issue of

16. We note that the parties in the instant case have the option, upon remand, to present the issue of comparative causation to the trial court, as fact finder, as opposed to impaneling a jury.

the value of lost household services of Mr. Tincher and Mrs. Tincher's loss of consortium. We affirm the trial court because we find the trial court's reasoning on this issue to be both thorough and sound. In so doing, we recognize that "[a] verdict is set aside as inadequate when it is so inadequate as to indicate passion, prejudice, partiality, or corruption, or where it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff." *Slaseman v. Myers*, 309 Pa.Super. 537, 540–541, 455 A.2d 1213, 1215 (1983) (citations omitted). "Particularly where the motion for a new trial is predicated on an allegedly inadequate verdict, appellate courts will reverse the lower court's decision only for clear abuse of discretion because this issue is viewed as being peculiarly within the competence of the trial court." *Palmer v. Brest*, 254 Pa.Super. 532, 536, 386 A.2d 77, 79 (1978) (citing *Wilson v. Nelson*, 437 Pa. 254, 258 A.2d 657 (1969)).

It is not disputed that expert testimony at trial established the figure of $43,428.00 as a reasonable value for the loss of Mr. Tincher's household services. However, no expert testified as to a figure which would compensate Mrs. Tincher for the loss of her husband's consortium. Under the wrongful death act, the widow is entitled to the pecuniary value of the society and comfort she would have received from her husband. *Slaseman v. Myers, supra* 309 Pa.Super. at 549, 455 A.2d at 1220. A surviving spouse cannot maintain a separate action for loss of consortium resulting from the death of a spouse but must recover damages for the loss of the deceased spouse's society in an action for wrongful death. *Linebaugh v. Lehr*, 351 Pa.Super. 135, 505 A.2d 303 (1986). We adopt the following analysis employed by the trial court as the basis for granting a new trial to the Tinchers, limited to a determination of the value of the lost household services of Mr. Tincher and Mrs. Tincher's consortium claim:

The jury's choice of the exact number agreed upon by the experts demonstrates to this Court the jury's failure

to award anything to Mrs. Tincher for her loss of consortium. While the children's intangible losses were covered in interrogatory 12(c), Mrs. Tincher's only chance for recovery of her intangible loss was in 12(b). The failure to award such damages could have been the result of the jury's misunderstanding their task as to 12(b), or it may have been a conscious choice to award her nothing. We find the latter highly unlikely. In either event, we find the award of no damages to Mrs. Tincher for her loss of consortium to be so inadequate as to shock this Court, and we find the "injustice of the verdict stands forth like a beacon" ...

Defendant Summa Corporation's main contention in opposition to a new trial on damages is that the jury's figure should not be disturbed because the amount awarded under 12(b) could have been a compromise figure. That is, the jury might have disbelieved *both* experts, and made their own calculation as to each component of those losses. We find it too much of a coincidence that the figure arrived at by the jury was $43,-428.00, the exact dollar figure quoted to them and agreed upon by both experts ...

Op. of Trial Court at 21–22.

The Tinchers also contend that the trial court should have awarded a new trial on the issue of damages for the loss of consortium suffered by the Tincher children. Under Pennsylvania law, a child can recover in a wrongful death action for the loss of companionship, comfort, society and guidance of a parent. *Steiner by Steiner v. Bell Telephone Co.*, 358 Pa.Super. 505, 510, 517 A.2d 1348, 1356 (1986), *aff'd.* 518 Pa. 57, 540 A.2d 266 (1988). This element of damages has also been described as "loss of guidance, tutelage, and moral upbringing." *Buchecker v. Reading Co.*, 271 Pa.Super. 35, 57, 412 A.2d 147, 158 (1979). We agree with the trial court that the jury adequately compensated the Tincher children for the loss of the society of their father which was described under interrogatory 12(c) as including, but not limited to, his guidance, tutelage, and

moral upbringing. We find no trial court error with reference to this element of the Tinchers' damages.

## DELAY DAMAGES

■ The trial court assessed delay damages against Hughes pursuant to the then existing Pa.R.C.P. 238. The trial court ordered that Hughes pay delay damages to the Waltons for the period of November 17, 1980 through June 4, 1984.[17] These dates correspond to the date the Walton plaintiffs filed their complaint and the date the Walton plaintiffs settled with Avco. The trial court awarded delay damages only upon what it had determined to be Hughes' share of the total jury verdict. The trial court correctly determined that the delay damages owed by Hughes should be calculated only upon Hughes' share of the total verdict. *See Hughes v. GAF Corporation,* 364 Pa.Super. 311, 528 A.2d 173 (1987); *Korn v. Consolidated Rail Corporation,* 355 Pa.Super. 170, 512 A.2d 1266 (1986). We must, however, vacate the order of the trial court with reference to Hughes' liability for delay damages, because we have determined that Hughes' share of the total verdict must be reevalutated on the basis of comparative causation. Upon remand, the trial court must assess delay damages in accordance with the newly amended Pa.R.C.P. 238, effective November 7, 1988. This new Rule 238 applies to actions pending "in which delay damages have not been determined." Pa.R.C.P. 238(f). In an effort to guide the trial court in the final resolution of this case, we have determined that the time period for which Hughes may be liable for delay damages under the newly amended Rule 238 will be the same: November 17, 1980 through June 4, 1984. Pa.R.C.P. 238(a)(2).

This case is controlled by the precedent set by this Court in *Baciotti v. Simmons,* 346 Pa.Super. 23, 498 A.2d 1351 (1985) (*en banc*), which, in our view, is unaffected by the

---

**17.** The trial Court did not award delay damages to the Tinchers because it awarded them a new trial, limited to specific damages issues.

recent amendments to Pa.R.C.P. 238.[18]   In that case, the plaintiff, Dawn Baciotti, filed suit to recover for personal injuries against Michael V. Simmons and Strasburg Township.   The Township offered to settle Baciotti's claim for $50,000.00 on March 1, 1982.   This settlement offer made on behalf of the Township remained open until trial but was never accepted by Baciotti.   Baciotti did agree, however, to settle with Simmons on March 6, 1982 for $100,000.00.   At trial, a verdict was returned for Baciotti in the amount of $135,000.00.   The jury apportioned the negligence of the parties as follows:  Baciotti-ten percent (10%); Simmons-forty percent (40%);  Strasburg Township-fifty percent (50%). A majority of this Court in *Baciotti* held that a nonsettling defendant is entitled to the benefit of any overpayment by the settling defendant for Rule 238 purposes.   This holding was based, at least in part, on the Court's recognition that after one defendant has settled, the plaintiff and the nonsettling defendant cannot be expected to negotiate with respect to the total amount of the possible verdict but will, instead, negotiate with respect to the actual amount which may still be recovered.   Thus, the *Baciotti* Court reasoned as follows:

> ... Baciotti's recovery was fixed by the jury at $135,-000.00.   Because Simmons had already paid $100,000.00, the only amount which Strasburg Township was liable to pay was $35,000.00.   On March 1, 1982, the Township had made an offer of $50,000.00 ...   It is clear that the Township's offer was greater than the Township's liability to pay damages to Baciotti.   Strasburg Township's liability for Rule 238 damages, therefore, was terminated on March 6, 1982. . . .   Baciotti's compensation for the deprivation of use of money withheld from her was tolled

**18.**  In *Baciotti v. Simmons, supra,* the Court did not rely on any provisions of Pa.R.C.P. 238 which have been altered by the recent amendments to that Rule.   The *Baciotti* majority based its decision upon the recognition that Rule 238 was originally adopted by the Pennsylvania Supreme Court as "an extension of the compensatory damages necessary to make a plaintiff whole."  *Id.,* 346 Pa.Superior Ct. at 27, 498 A.2d at 1353 (citations omitted).   The Court also considered the provisions of the U.C.A.T.A., 42 Pa.C.S.A. § 8321 *et seq.* in reaching its decision.

after the settlement with Simmons was complete because the continuing offer of $50,000.00 was reasonable in light of the jury's findings. Baciotti's rejection of it ... was unreasonable.

*Id.*, 346 Pa.Superior Ct. at 31, 498 A.2d at 1355.

When Avco settled with the Waltons for more than the total verdict rendered in Walton's favor, Hughes' liability for Rule 238 damages was terminated. Thus, the trial court should compute the time period for the imposition of Rule 238 damages as running from November 17, 1980 through June 4, 1984.

## CONCLUSION

For all of the foregoing reasons, we affirm in part and reverse in part the orders entered by the Philadelphia Court of Common Pleas on July 17, 1987. We now remand this matter for further proceedings consistent with this Opinion. Jurisdiction is relinquished.

BROSKY, J., files a concurring and dissenting opinion.

BROSKY, Judge, concurring and dissenting:

I agree with the majority's disposition of all issues except two.

On the issue of delay damages, I would remand to the trial court for recomputation of delay damages on the basis of Hughes' share of the verdict without respect to the comparative causation of the parties as suggested by the majority. I would not utilize the majority's theory of comparative causation as the basis for computation of an award of delay or any other damages because this theory of recovery is not extant either in any legislation or in any judicial determination in this Commonwealth, and the majority concedes as much. The majority believes that such a basis for allocation of damages in strict product liability recovery is, nonetheless, rooted in equitable principles. Accordingly, the majority would remand for the trier of fact to employ a comparative causation determination between two

tortfeasors both held to be strictly liable, or, at the parties' option, to the trial judge, instead of a jury.

As I previously stated, such a theory of recovery does not exist either by grace of statute or decisional law in this Commonwealth. However, without passing upon its viability, I believe that this type of recovery theory is a more appropriate expression of legislative, rather than judicial will. *See e.g.*, 42 Pa.C.S.A. § 7102, dealing with comparative negligence. Hence, my dissent.